[No. B171593. Second Dist., Div. One. Sept. 13, 2005.]

BRUCE HOPE, Plaintiff and Respondent, v.
CALIFORNIA YOUTH AUTHORITY, Defendant and Appellant.

## Counsel

Bill Lockyer, Attorney General, Jacob A. Appelsmith, Assistant Attorney General, Elizabeth Hong, Laura Lee Gold, Michelle Logan-Stern and Jerald L. Mosley, Deputy Attorneys General, for Defendant and Appellant.

Pine & Pine, Norman Pine, Beverly Tillett Pine; Law Offices of Victor L. George and Victor L. George for Plaintiff and Respondent.

OPINION

**MALLANO, Acting P. J.**—Plaintiff, a gay man, filed suit against his former employer, alleging sexual orientation harassment in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). The case was tried to a jury, which found in plaintiff's favor and awarded him economic and noneconomic damages.

The employer argues on appeal that substantial evidence does not support the jury's determination of liability or the award of damages. We conclude otherwise and affirm.

# I

## BACKGROUND

For around 18 years, plaintiff Bruce Hope worked as a cook or chef in various restaurants and other establishments. He eventually decided he "wanted something more permanent"—a lifetime job with retirement and a pension—and, at the age of 34, he applied for a cook position with the State of California. Hope took a written test and was interviewed by a four-member panel. Based on his scores, he was notified of openings in two correctional facilities. He interviewed for the jobs.

Hope was offered a position as a cook at the Fred C. Nelles Youth Correctional Facility (Nelles) in Whittier, and accepted it. He started work on August 1, 1996, as an "Intermittent Cook I"—he was "on call" and was not guaranteed a full shift or a full month of work. Essentially, Hope would "fill in" for cooks who were ill or on vacation.

Shortly after starting as an "Intermittent Cook I," Hope became a "Limited Term Cook I"—he had a full-time position but it was not clear how long the position would last. A couple of months later, Hope became a "Limited Term Cook II," but like the previous positions, it was not permanent. In December 1996, Hope accepted a new position as a "Permanent Cook I," even though it meant a cut in pay. He believed that it would be more beneficial in the long run to become a permanent employee, notwithstanding the lower salary. Around this time, Hope moved from Downey to Whittier so he could be within walking distance of Nelles. He lived five minutes away.

While at Nelles, Hope was subjected to derogatory remarks based on his sexual orientation. Hope testified that his immediate supervisor, Felipe Marcellino, called him a "motherfuckin' faggot" and a "homo." Santos Ortiz, a security officer assigned to the kitchen, did the same. Ortiz also used other

derogatory terms, such as "faggot ass bitch" and "faggot ass motherfucker." When asked how often Ortiz called him a "faggot ass bitch," Hope replied, "It was common." Hope estimated that Ortiz called him a "faggot ass motherfucker" "a lot"—around 150 times.

Ortiz disliked Hope, in part, because Hope had once reported him for giving an unknown substance to one of Nelles's youthful offenders, or wards. Employees were not permitted to give "contraband" to wards. Hope testified that Ortiz's "whole attitude" toward him changed after this incident.

Michael Hedgepath, a "Supervising Cook I" and one of Hope's supervisors, testified that Marcellino referred to Hope as a "homo" or a similar derogatory term every day. Hedgepath testified that on one occasion he heard Marcellino use a derogatory term—"faggot"—in Hope's presence. The other instances occurred when Hope was not around. Hope was "pretty sure" he told the superintendent that Marcellino had called him a "faggot."

Hedgepath heard Ortiz use derogatory terms—like "faggot"—in front of management, the kitchen staff, and the wards. On one occasion, Hedgepath heard Ortiz say "faggot" directly to Hope. Hedgepath told Ortiz to stop the name-calling. Ortiz said "he didn't care" and didn't "give a damn what that homo has to say." Ortiz continued to call Hope names. Hedgepath, although aware of this, did not take any further action. Instead, when Hedgepath heard Ortiz engage in name-calling, he would "just usually turn it off and leave it alone." Hedgepath further testified that Ortiz was sometimes "cruel" to Hope and that Ortiz frequently "mistreated" Hope.

Hope testified that Ortiz called him "faggot ass motherfucker" in front of the wards while they were serving dinner. Ortiz also told a group of wards in the main kitchen that Hope looked at them because he thought they were pretty. Hope's coworkers and at least one of his supervisors heard that remark. Thereafter, the wards began treating Hope differently, calling him a "faggot" and ignoring his instructions. For example, one ward, in the presence of other wards, said, "What's up girlie-girl, I'm talking to you Bruce."

At Nelles, the wards assisted the cooks with cooking and cleanup so that the cooks did not have to do all the work by themselves. The wards assigned to Hope performed a substantial amount of work, making his job less difficult. That changed when Ortiz told the wards not to help him anymore. As a result, Hope had to do all the work by himself. Other cooks continued to enjoy the assistance of wards. Dennis Mitchell, another security officer assigned to the kitchen, as "Group Supervisor," testified that it would be a "hardship" for a cook to work without the assistance of wards.

Hope testified that Ortiz "would take trash and throw it all over my area." Ortiz once threw a trash can in an area Hope had just cleaned. At other times, "they"— individuals Hope had not seen—threw food or trash in a cleaned area. Each time, Hope had to clean the area without help.

Hope approached Hedgepath and asked why Hope was having problems with some of his coworkers. Hedgepath said other employees might have a "preconception or preconceived notion of what [Hope's] sexual orientation was" and that Hope was being "picked on" because some employees perceived him to be gay. Hedgepath believed that Ortiz did not like Hope because of Hope's sexual orientation. Hedgepath did not report any of this to his superiors and told Hope he could not control the perceptions of others.

At trial, Hedgepath stated, "I feel like my job is primarily food production and service. I try not to get into personal things." Yet, as the business manager testified, Hedgepath was a "lead person" and, as such, was obligated to contact his immediate supervisor, Roger Salazar, the "Supervising Cook II," if any of Hedgepath's subordinates were being mistreated.

Hope went to see Maggie Yamamoto, the food manager, and asked her why others were saying that he had human immunodeficiency virus (HIV) or acquired immune deficiency syndrome (AIDS). She said, "Bruce, because you are always sick. Everyone thinks you are gay. They think you have AIDS."

Renee Bozeman was employed at Nelles from November 19, 1979, to January 17, 2000. She started in the personnel office, where she worked for 10 years. After working in the program center for about one year, she returned to the personnel office. In the early 1990's, she moved to the kitchen office. When Yamamoto was hired as the food manager, Bozeman became her secretary.

Bozeman testified that, during the two-year period between early 1996 and early 1998, she witnessed Marcellino mistreat Hope because of his sexual orientation. Marcellino would "rant and rave" and say he was not going to work with "this gay guy." He would refer to Hope as a "faggot" in front of other employees. When Marcellino displayed this type of conduct in Yamamoto's office, Yamamoto made no effort to correct his behavior. She would simply tell him to "calm down." According to Bozeman, Marcellino also referred to Hope as a "faggot" in front of the wards. As she further testified, "And when the wards find out, it just continues on and on and on." Hope complained about Marcellino's conduct to the business manager, who did nothing to resolve the problem, but submitted the information to Vivian Crawford, the superintendent.

Cooks had two forms of protection from physically hostile wards: (1) the kitchen security detail and (2) written behavior reports. If a ward misbehaved, a staff member could document the incident in a behavior report and send it to kitchen security. The report was forwarded to a committee, which decided what discipline to impose. Hope gave his reports to Ortiz, until Ortiz starting tearing them up in front of the wards. Hope informed one of his supervisors, Gwen Rudolph, of Ortiz's conduct. Ortiz was not counseled or disciplined. As Superintendent Crawford testified, "[I]f you don't hold [the wards] accountable, generally you get more misbehavior." For example, a ward subsequently approached Hope carrying a toilet plunger and said, "I'll beat you down motherfucker."

In 1996, some of the wards accused Hope of sexually assaulting them and making sexual advances. The accusations were investigated by the Whittier Police Department and Nelles's internal affairs department. The investigations started in early 1997 and concluded about six months later. The accusations were found to be unsubstantiated. No charges were filed, and Nelles took no action on the matter.

In December 1997, Hope told Yamamoto a ward had said that "a lot" of the kitchen staff did not like him, were "going to get him," and would tell the wards where he lived. An investigation followed. Yamamoto interviewed four wards. One of them stated he had (1) asked Hope where he lived, (2) told Hope "somebody" said he lived "around here," and (3) told Hope "some kitchen staff do not like him . . . because he is homosexual." The ward denied telling Hope that the kitchen staff was out to get him. The ward also said he was "just playing" with Hope. After the interviews, Hope was informed that these concerns were unsubstantiated.

As of early 1997, Hope was on the eligibility list for promotion to "Cook II." He had taken and passed the test for that position. When an opening occurred, Yamamoto told Bozeman, her secretary, to type up the paperwork promoting Hope. Bozeman prepared the papers, and Yamamoto signed them, as did the superintendent. Yamamoto asked Hope to come to her office. He went. She congratulated him on the promotion, saying, "You are my new Cook II." Hope was happy and excited about the promotion. As he testified, "I know I got the Cook II position."

About four days after the promotion, Yamamoto and Salazar told Bozeman that Hope's promotion was being revoked. Bozeman had never heard of a promotion being revoked and told them "[i]t wasn't right." Bozeman repeatedly asked Yamamoto why Hope's promotion was being revoked and always got the same answer, "He is just not right." Yamamoto "never would pinpoint anything." Bozeman testified that, based on her years of work in the

personnel office, the revocation was against departmental policies and procedures. Eventually, the position went to someone else.

After hearing about the revocation, Hope was upset. He talked to Bozeman about it. She told him she did not understand the reason for the revocation and advised him to get an attorney. Before the revocation, Bozeman observed that Hope was happy at work. Afterward, he was not. "He just wasn't the same person."

By memorandum dated January 2, 1998, Hope complained to Yamamoto that "on many occasions" Ortiz had caused him problems, resulting in "an ongoing harassment problem." Hope stated Ortiz had made comments to the wards, such as " 'Bruce looks at you like that because he thinks you are pretty,' " and " 'If Bruce writes you up I will tear it up.' " Ortiz had cursed at Hope, saying, " 'I will fuck your mother fuckin ass up,' " and, " '[You're] nothing but a god damn snitch.' " Ortiz had also thrown trash "all over my area." The memo concluded, "I would like some kind of resolution to these matters. I have exhausted all of my efforts to resolve these matters myself with no success. I am requesting assistance from you. This ongoing harassment . . . by Mr. Ortiz needs to be addressed by higher authority."

On January 13, 1998, Hope attended a meeting with Yamamoto, Ortiz, and Lieutenant Chapman to discuss Hope's complaints. Ortiz denied Hope's accusations and asked for a letter of apology. No action was taken against Ortiz. Chapman told Ortiz and Hope that discourteous treatment of others would not be tolerated, they must treat each other with respect, Ortiz was to go to a Supervising Cook I if he wanted anything to be done, and disciplinary action would be taken if the conflict continued.

Hope had been diagnosed with HIV two months before starting work at Nelles. He began taking medication, and his health improved. After arriving at Nelles, Hope's HIV did not affect his performance. During the first year of his employment, he had an excellent attendance record.

But in October 1997, Hope began missing work. He had told Crawford he was having a lot of problems with Ortiz, Ortiz was making his job very difficult, and sometimes he would call in sick because he "couldn't deal" with Ortiz. When Hope called in sick and spoke to Hedgepath, Hope occasionally blamed job stress for his absence.

According to Hope's treating psychiatrist, beginning sometime between six and 10 months after Hope started work, he was under "enormous tension and pressure and anxiety" because of "mistreatment" from coworkers and the administration, as well as a lack of "protection and support from management." The anxiety caused Hope to develop a bleeding blister in the retina of

his right eye, leading to a permanent loss of vision. Other than hand motions within a few feet of his face, Hope cannot see anything through his right eye. Hope's physician told him that this type of blindness is typically caused by job stress and that it is more common in doctors and lawyers.

In January 1998, Yamamoto told Hope that, based on his number of absences in September and October 1997, he was approaching the point of abusing sick leave. Hope replied that he had something to tell her and began crying. He asked Yamamoto not to tell anyone else. She promised. Hope then said he was HIV positive. Yamamoto started crying too and said she was sorry. Hope went back to the kitchen to work.

Ten minutes later, Yamamoto placed a call to the kitchen, asking that Hope come to her office. He went. Yamamoto said she had contacted her supervisor about Hope's HIV status and apologized for disclosing the information. Her supervisor, in turn, had contacted the superintendent. Yamamoto reported, "They called Sacramento and we're just waiting for an answer." Hope asked, "An answer to what?" Yamamoto replied, "To see if [you have] a job or not." Hope went back to the kitchen. At the end of the day, Yamamoto met with Hope again and told him "Sacramento" had said Nelles could not discriminate against him.

Thereafter, Hope attended a meeting with Yamamoto and Dave Gaydos, the business manager. Gaydos suggested that Hope consider giving up his full-time position and become a "limited term" cook. Gaydos said Hope would be called for work whenever there was a shortage of cooks. Hope said no. Gaydos responded, "Okay, we'll give it 90 days to see if your attendance improves a little bit better."

Forty-five days later, Hope met with Yamamoto, Gaydos, and Salazar. Gaydos again offered Hope the opportunity to work intermittently. Hope said no. Gaydos also discussed the possibility of retiring under the state retirement system and collecting benefits under Social Security, but, as they learned later in the meeting, Hope did not qualify for either. The meeting ended, and Hope returned to the kitchen.

During his five years of employment at Nelles, Hope complained to Hedgepath, Rudolph, Salazar, Yamamoto, Gaydos, and Crawford—all supervisors or superiors—about the harassment and abuse he received. Hope had at least 20 conversations with Crawford on the subject. As Hope testified, "Everyone in the whole institution knew that I had a problem with Ortiz."

In one conversation, Hope told Yamamoto, "I can't take it anymore. . . . Ortiz is giving me a very hard time." He told her Ortiz was "cussing" and

"yelling" at him, telling his assigned wards what to do, and preventing him from doing his job. Hope asked whether a different security officer could be assigned to the kitchen. Yamamoto replied, "We cannot schedule you around anybody and . . . you just have to work and you better not go home."

In March 1999, Hope was denied a "merit salary adjustment" in part because his "working relationship with staff and wards has been substandard. For instance, you have had several disagreements with Mr. Santos Ortiz . . . [and] Mr. Felipe Marcellino[, among others]."

In June 1999, Hope was given a counseling memorandum for sleeping in the bathroom. Hope explained that the medication he was taking had made him dizzy and that he did not realize it would cause him to fall asleep. The memo stated that sleeping on the job was a violation of Nelles's policies and procedures, and, in the future, Hope should contact his immediate supervisor if he felt drowsy.

On or about July 12, 1999, 14 kitchen staff employees, including Hope, signed a "Petition," stating: "We the kitchen staff . . . are very unhappy with kitchen security Santos [Ortiz]. He is very belligerent to us kitchen staff, and to many of the male kitchen staff. He calls them out as if he wanted to fight. . . ." The petition further stated that Ortiz was acting in an unprofessional manner and interfering with the staff's performance of their duties. Ortiz left the kitchen on August 1, 1999. He retired in 2001.

With respect to Nelles's written antiharassment policy, Crawford testified that if Hedgepath had heard an employee frequently calling Hope a "faggot" or "homo," Hedgepath should have reported it. She also stated that Marcellino should not have referred to Hope in derogatory terms while Marcellino was in Yamamoto's office. And she said Ortiz should not have told the wards that Hope thought they were pretty. According to Crawford, all of these acts or omissions would violate Nelles's antiharassment policy.

Hope testified that his situation never improved: "It was like a bad dream that I couldn't wake up from . . . . I said I deserve to be here. They're not going to chase me out. I stuck it out. Somebody is going to listen to me one day. Things are going to get better. . . . [I]t was like one thing after another and it never got better. It just got worse and worse and worse but I hung in there and I said they're not—I want to fight this and when Vivian Crawford came aboard she was like my last resort. . . . I went in her office and talked to her. I told her everything that was going on in the kitchen. . . . I hung in there as long as I possibly could until I couldn't handle it anymore and I was like to the point where I no longer had anymore control over my job. I could not

have any control over the wards. I didn't get any help from any of the administration. . . . [E]very time I complained or I reported or I did my job the way I was supposed to do they turned around and used it against me. You know, they stopped my salary [adjustment] because I complained about these people who were harassing me . . . . I complained about these people and you use it against me like I don't get along with these people."

In July 2001, Hope was placed on a medical leave of absence. He did not return to work. He gets $757 per month from the state.

In October 2001, Hope filed this action against the California Youth Authority (CYA). A first amended complaint followed, alleging causes of action under the FEHA for discrimination, harassment, retaliation, and failure to prevent harassment. Hope also alleged a common law claim for wrongful termination in violation of public policy. In general, Hope alleged that he had been mistreated because of his sexual orientation and HIV status.

Hope voluntarily dismissed the wrongful termination claim. The trial court summarily adjudicated the discrimination claim in favor of CYA by way of a motion for summary adjudication.

The case was tried to a jury beginning June 30, 2003. On July 22, the jury returned a verdict in favor of Hope on both causes of action: harassment and retaliation. The jury awarded Hope $917,104 in economic damages and $1 million in noneconomic damages. Judgment was entered accordingly.

In subsequent proceedings, CYA's motions for a new trial and judgment notwithstanding the verdict were denied. Hope's motion for attorney fees was granted, as was a supplemental motion for additional fees. Hope also recovered costs and postjudgment interest. CYA appealed.

## II

### DISCUSSION

The FEHA states that "[i]t shall be an unlawful employment practice . . . [¶] . . . [¶] . . . [f]or an employer, . . . because of . . . sexual orientation . . . to harass an employee . . . . Harassment of an employee . . . by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (Gov. Code, § 12940, subd. (j)(1); all further statutory references are to the Government Code unless otherwise indicated.)

■ "[A]n employee claiming harassment based upon a hostile work environment must demonstrate that the conduct complained of was severe enough *or* sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their [sexual orientation]. . . . The working environment must be evaluated in light of the totality of the circumstances: '[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462 [30 Cal.Rptr.3d 797, 115 P.3d 77], citations omitted, italics added.)

"In determining what constitutes 'sufficiently pervasive' harassment, the courts have held that acts of harassment cannot be occasional, isolated, sporadic, or trivial, rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature." (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 610 [262 Cal.Rptr. 842].)

The harassment must satisfy an objective and a subjective standard. " '[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." . . .' " (*Miller v. Department of Corrections, supra,* 36 Cal.4th at p. 462.) And, subjectively, an employee must perceive the work environment to be hostile. (See *Rieger v. Arnold* (2002) 104 Cal.App.4th 451, 460 [128 Cal.Rptr.2d 295].) Put another way, "[t]he plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that [he] was actually offended." (*Fisher v. San Pedro Peninsula Hospital, supra,* 214 Cal.App.3d at pp. 609–610, fn. omitted.)

■ Further, "[t]he FEHA imposes two standards of employer liability for sexual [orientation] harassment, depending on whether the person engaging in the harassment is the victim's supervisor or a nonsupervisory coemployee. The employer is liable for harassment by a nonsupervisory employee only if the employer (a) knew or should have known of the harassing conduct and (b) failed to take immediate and appropriate corrective action. (§ 12940, subd. (j)(1).) This is a negligence standard. . . . Because the FEHA imposes this negligence standard only for harassment 'by an employee other than an

agent or supervisor' (§ 12940, subd. (j)(1)), by implication the FEHA makes the employer strictly liable for harassment by a supervisor." (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1040–1041 [6 Cal.Rptr.3d 441, 79 P.3d 556], citation omitted.)

On appeal, CYA contends the jury verdict is not supported by substantial evidence. Under the substantial evidence test, " '[t]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings. . . . 'We must therefore view the evidence in the light most favorable to the prevailing party, giving [him] the benefit of every reasonable inference and resolving all conflicts in [his] favor . . . .' " (*Estate of Leslie* (1984) 37 Cal.3d 186, 201 [207 Cal.Rptr. 561, 689 P.2d 133], citations omitted.) "[T]he focus is on the quality, not the quantity of the evidence. Very little solid evidence may be 'substantial,' while a lot of extremely weak evidence might be 'insubstantial.' " (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871–872 [269 Cal.Rptr. 647].) Indeed, the testimony of a single witness may be sufficient. (*In re Marriage of Birnbaum* (1989) 211 Cal.App.3d 1508, 1513 [260 Cal.Rptr. 210].)

The jury found in favor of Hope on his retaliation and harassment claims, either one of which, if supported by substantial evidence, provides a basis for affirming the jury's determination of liability. We discuss only the harassment claim because substantial evidence supports the verdict as to that claim.

## A.  Hostile Work Environment

■  We conclude that substantial evidence supports the jury's determinations that Hope was subjected to harassment because of his sexual orientation, the harassment was sufficiently severe or pervasive, Hope's superiors either knew or should have known about the harassment and its cause, and Nelles did not take immediate and corrective action to stop the harassment.[1]

### 1.  Severity and Pervasiveness of Harassment

The evidence supports the jury's implied finding that Hope was harassed and that the harassment was sufficiently severe *or* pervasive to alter the conditions of his employment and create a work environment that qualifies as hostile or abusive.

Hope testified that his *immediate* supervisor, Marcellino, called him a "motherfuckin' faggot" and a "homo." Hedgepath stated that Marcellino

---

[1] Hope bases his harassment claim on alternative grounds: sexual orientation and his HIV status. We discuss only the first ground because we ultimately conclude that the evidence supports liability on that theory.

called Hope a "homo" or similar derogatory term *every day*, although Hedgepath was aware of only one instance when Marcellino used a derogatory term in Hope's presence. (See *Fisher v. San Pedro Peninsula Hospital, supra*, 214 Cal.App.3d at pp. 610–611 [plaintiff must be personally subjected to derogatory remarks or personally witness the harassing conduct in his or her immediate work environment to establish hostile workplace]; *Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 519 [76 Cal.Rptr.2d 547] [if plaintiff neither witnesses incidents of harassment nor knows they occurred, such incidents are irrelevant]; *Kovatch v. California Casualty Management Co.* (1998) 65 Cal.App.4th 1256, 1268 & fn. 3 [77 Cal.Rptr.2d 217] [same], disapproved on another point in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

Hope testified that Ortiz called him a number of derogatory terms. Ortiz called him a "faggot ass bitch" so often it became commonplace. Ortiz called him a "faggot ass motherfucker" around 150 times. Ortiz also called him a "motherfuckin' faggot" and a "homo." On one occasion, Ortiz told a group of wards in the main kitchen that Hope looked at them because he thought they were pretty.

Ortiz instructed the wards not to assist Hope in cooking and cleaning up. As a consequence, Hope had to do all the work by himself. Other cooks continued to have the assistance of wards. As security officer Mitchell testified, it would be a "hardship" for a cook to work without the help of wards. Hedgepath stated that Ortiz sometimes treated Hope in a "cruel" manner and often "mistreated" him. For example, Ortiz would throw trash in an area Hope had just cleaned, forcing Hope to clean it again.

Ortiz tore up Hope's "behavior reports" in front of the wards and told them he would continue to do so if Hope submitted a report. The reports served as a deterrent to physical violence and other misbehavior by the wards. Ortiz's conduct conveyed to the wards that Hope was no longer protected by the system, placing him in danger of physical violence. This gave Hope reason to worry constantly about his safety. Hope also had cause for concern when, according to Hope, a ward told him "a lot" of the kitchen staff did not like him, were "going to get him," and would tell the wards where he lived, especially given that he lived so close to Nelles. Hope therefore had reason to fear a physical attack inside and outside Nelles.

Hope was promoted to Cook II and soon thereafter the promotion was revoked. As an explanation, Yamamoto would say only that Hope was "just not right." The revocation violated departmental policies and procedures. As

Bozeman noted, Hope "wasn't the same person" afterward. He was no longer happy at work. Later, Hope was denied a merit salary adjustment in part because he had had several disagreements with Ortiz and Marcellino—the very individuals who were calling him a "motherfuckin' faggot" and a "homo."

Hope testified that the situation "just got worse and worse and worse." His psychiatrist testified about the anxiety he was experiencing and its effect. Eventually, Hope "no longer had anymore control over [his] job." He told Yamamoto, "I can't take it anymore." Hope also told Yamamoto that he occasionally called in sick because he "couldn't deal" with Ortiz.

We conclude that the evidence supports a finding that the harassment would have interfered with a reasonable employee's work performance and seriously affected the psychological well-being of a reasonable employee and that Hope himself believed that the work environment was hostile and offensive. There is substantial evidence that Hope was subjected to harassment that was sufficiently severe or pervasive to create a hostile work environment.[2]

### 2. Motive and Knowledge of Harassment

CYA acknowledges that Hope complained to his superiors about some of the conduct he considered to be "harassment" but faults him for not telling them the harassment was motivated by his sexual orientation. If Hope was not harassed *because of* a protected status—like sexual orientation—CYA cannot be found liable. (See *Slatkin v. University of Redlands* (2001) 88 Cal.App.4th 1147, 1157–1159 [106 Cal.Rptr.2d 480]; *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1118 [75 Cal.Rptr.2d 27].) And, as stated, an employer is not liable for harassment committed by a nonsupervisory employee—here, Ortiz—unless the plaintiff's superiors knew or should have known about the harassment. (See *State Dept. of Health Services v. Superior Court, supra*, 31 Cal.4th at pp. 1040–1041.) We conclude that Hope's superiors had the requisite knowledge.

Hope testified, "[e]veryone in the whole institution knew that I had a problem with Ortiz." Yamamoto told Hope, "Everyone thinks you are gay." Marcellino, Hope's immediate supervisor, would "rant and rave," say he was not going to work with "this gay guy," and referred to Hope as a "faggot"—

---

[2] CYA contends it cannot be held liable for acts of harassment committed by the wards because they were not "employees" within the meaning of the FEHA. We do not reach this issue because we do not rely on such harassment in reviewing the judgment.

all in Yamamoto's presence. When Yamamoto interviewed wards in December 1997 about an alleged threatening statement made to Hope, one ward admitted telling Hope that some of the kitchen staff did not like him "because he is homosexual"; the ward claimed in the interview that he had been joking. And Hope testified he was "pretty sure" he had told Crawford that Marcellino had called him a "faggot." He also told her "everything that was going on in the kitchen."

Hedgepath heard Ortiz call Hope derogatory terms, like "faggot," on a daily basis. Hedgepath believed that Ortiz was sometimes "cruel" to Hope and often "mistreated" him and that Ortiz disliked Hope because he was gay. When Hope asked Hedgepath why Hope was having problems with some of his coworkers, Hedgepath said he was being "picked on" because some employees might perceive him to be gay. Yet, Hedgepath—a supervisor—did not report any of this to his superiors. When Ortiz called Hope derogatory terms, Hedgepath would "just usually turn it off and leave it alone."

Thus, Hope's superiors knew or should have known that he was being harassed because of his sexual orientation.

Nor can it be doubted that Hope complained about the harassment. In a January 2, 1998 memo, Hope informed Yamamoto that "on many occasions" Ortiz had caused him problems, resulting in "an ongoing harassment problem." The memo described several specific acts of harassment. Hope testified that he complained about the harassment to Hedgepath, Rudolph, Salazar, Yamamoto, Gaydos, and Crawford. He had at least 20 conversations with Yamamoto on the subject, stating on one occasion, "I can't take it anymore. . . . Ortiz is giving me a very hard time."

Thus, CYA had actual knowledge of the harassment.[3]

---

[3] The trial court permitted Hope to put on evidence about the investigation conducted by the Whittier Police Department and Nelles's internal affairs department but granted his in limine motion, precluding CYA from offering evidence about the nature of the charges—sexual advances and assaults with respect to the wards. We do not review the trial court's ruling for two reasons. First, in its opening brief, CYA raises this issue with respect to Hope's *retaliation* claim, but we base our decision on the harassment claim. Second, even if the trial court erred, the error was not prejudicial. "[T]he error was harmless, because it is not reasonably probable defendant would have obtained a more favorable result in its absence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570 [34 Cal.Rptr.2d 607, 882 P.2d 298].) Absent prejudice, there is no basis for reversal. (See *id.* at p. 574; *Taylor v. Varga* (1995) 37 Cal.App.4th 750, 759, fn. 9 [43 Cal.Rptr.2d 904].)

### 3. *Corrective Action*

An employer is not liable for acts of harassment committed by a nonsupervisory employee—here, Ortiz—unless the employer failed to take immediate and appropriate corrective action. (See § 12940, subd. (j)(1).) CYA failed to do so.

Notwithstanding Hope's complaints about Ortiz, CYA did not take immediate or appropriate action to stop the harassment. For example, in response to Hope's January 2, 1998 memo, which contained accusations of a serious nature, Lieutenant Chapman told both men that they had to be courteous and respect one another, Ortiz should go to a Supervising Cook I if he wanted anything to be done, and corrective action would be taken if the conflict continued.

On appeal, CYA argues that because Ortiz denied the accusations in the memo, "management was placed in an impossible position"—Ortiz and Hope disagreed about what had happened. But Hedgepath knew exactly what was going on—Ortiz was mistreating Hope—and Hedgepath believed that Ortiz's conduct was motivated by Hope's sexual orientation. If management had conducted any kind of investigation to determine the truth, Hedgepath could have provided the necessary information. In any event, because Hedgepath was a supervisor, his knowledge was imputed to CYA regardless of whether he was questioned. (See § 12940, subd. (j)(1).)

Further, although Hedgepath told Ortiz to stop referring to Hope in derogatory terms, Ortiz continued to do so, and Hedgepath took no further action to remedy the situation. When Hope told Yamamoto, "I can't take it anymore. . . . Ortiz is giving me a very hard time," she did nothing to help him.

Ortiz was not removed from his kitchen post until, *at the earliest*, one and one-half years after the January 2, 1998 memo and, only then, in response to a petition from 14 employees on the kitchen staff asking that Ortiz be assigned elsewhere.

Finally, Hope complained about the harassment to six of his superiors, but, as he testified, the situation "just got worse and worse and worse . . . . I was like to the point where I no longer had anymore control over my job. . . . I didn't get any help from any of the administration."

Thus, to the extent management took any corrective action, it was too little, too late.

B. *Economic Damages Award*

CYA argues that the economic damages awarded by the jury are not supported by substantial evidence. This argument is based on four points, none of which has merit.

First, CYA contends, based on the amount of the award, the jury must have determined, without sufficient evidence, that Hope had been improperly denied the promotion to the Cook II position. Although the evidence on this issue may have been in conflict, the testimony of Hope and Bozeman provided sufficient evidence to support the jury's implied finding that Hope deserved the job and that his promotion to Cook II was unlawfully revoked.

Second, according to CYA, there was insufficient evidence that Hope was denied the Cook II promotion because of his sexual orientation. But we have already determined that CYA is liable for sexual orientation harassment. Consequently, the jury could have properly concluded that Hope's promotion was revoked because he is gay.

Nevertheless, CYA maintains that Yamamoto—the decision maker—did not know Hope was gay until a year *after* Hope applied for the Cook II position. But the jury may have decided otherwise. In addition, CYA's record references for this proposition concern Yamamoto's knowledge of Hope's *HIV status*, not his sexual orientation. And as Yamamoto told Hope, "Everyone thinks you are gay."

Third, the jury implicitly determined that, but for the harassment, Hope would have been employed by the state until retirement age. Hope testified that he accepted the offer to work at Nelles because he was looking for a permanent, lifetime job. CYA challenges the award of future lost earnings because, in its view (1) Hope would have been terminated for poor performance or excessive absences and (2) Hope did not have an average life expectancy due to his medical condition.

But the jury could have properly found that any performance problems and excessive absences were attributable to CYA's unlawful harassment. And CYA cites no authority for the contention that a plaintiff who is HIV positive must offer evidence that he or she has a normal life expectancy. (See *Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445, 1448 [37 Cal.Rptr.2d 126] [contention is waived if not supported by legal authority].) In fact, Hope's psychiatrist testified that Hope did not have AIDS, he was responding well to medications, and he "had a good acceptance and adjustment to the HIV." Hope himself testified about his HIV, stating, "I've been doing quite well with it."

Finally, CYA contends Hope did not offer sufficient evidence to prove that he could never work again. In other words, the jury found that Hope could not mitigate his future loss of earnings by obtaining employment. CYA argues that the evidence did not support such a finding. This argument is based on a faulty legal premise, namely, that the employee has the burden of proving an inability to work. "The general rule is that the measure of recovery . . . is the amount of salary . . . for the period of service, less the *amount* which the *employer affirmatively proves* the employee has earned or with reasonable effort might have earned from other employment. . . . [T]he *employer must show* that the other employment was *comparable*, or *substantially similar*, to that of which the employee has been deprived; the employee's rejection of or failure to seek other available employment of a different or inferior kind may not be resorted to in order to mitigate damages." (*Parker v. Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181–182 [89 Cal.Rptr. 737, 474 P.2d 689].)

At trial, there were "dueling" experts testifying about whether Hope could work again. Hope himself made clear that he wanted to go back to work. But CYA offered no evidence as to the *amount* that Hope might have earned through reasonable effort. Nor did CYA make any showing about the availability of *comparable* or *substantially similar* employment. For these reasons, CYA's mitigation argument fails.

## C. *Noneconomic Damages Award*

The jury awarded Hope $1 million in noneconomic damages. CYA argues that the award is so grossly disproportionate to the evidence of Hope's emotional distress that "it shocks the sense of justice."

" ' ". . . An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." . . .' " (*StreetScenes v. ITC Entertainment Group, Inc.* (2002) 103 Cal.App.4th 233, 245 [126 Cal.Rptr.2d 754].) " '[T]here is no fixed or absolute standard by which to compute the monetary value of emotional distress.' " (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1067, fn. 17 [232 Cal.Rptr. 528, 728 P.2d 1163].) "[T]he jury is entrusted with vast discretion in determining the amount of damages to be awarded . . . ." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608].)

CYA contends the award is excessive because Hope's attorney "attempted to incite the passion and prejudice of the jurors" during closing argument. CYA quotes several passages from the argument, such as, "CYA is an

acronym for [']Cover Your Ass['],'' and "Mr. Hope, as one guy, took on the whole State of California . . . ." We conclude that the quoted passages did not inflame the jury. CYA offers no authority suggesting otherwise. (See *Interinsurance Exchange v. Collins, supra,* 30 Cal.App.4th at p. 1448 [contention is waived if not supported by legal authority].)

CYA offers a second reason for reversing the award: The jury could not distinguish between the emotional distress caused by CYA and the emotional distress caused by other sources, for example, the acts of harassment committed by the wards. Not so. Even though the jury heard about a number of factors that could have contributed to Hope's emotional distress, there is no basis for concluding the jury could not separate the actionable harassment from the nonactionable and the harm caused by the former.

CYA further argues that, because the damages award is not supported by the evidence, the trial court abused its discretion in denying its motion for a new trial. On the contrary, the award does not shock the conscience or suggest the jury was anything other than objective in considering the evidence. That ends our inquiry.

Finally, the trial court did not conclude it lacked authority to grant a remittitur of damages. After the trial court had heard argument on CYA's motions for a new trial and judgment notwithstanding the verdict, it denied them. The trial court then considered Hope's motion for attorney fees. During argument on that motion, defense counsel stated, "I would propose that this court consider a remittitur . . . ." Hope's attorney responded, "Are we reopening the argument of the previous motions, your Honor or are we still on the motion for fees?" The trial court stated, "I think to the extent that there was a—that there is a request for a remittitur, I think that would have had to have been part of the noticed motion. [¶] I understand your point, but bringing it at this point is a little"—at which point defense counsel interjected, "This court has discretion to sua sponte order or issue a remittitur, your Honor."

Thus, the trial court declined to hear CYA's request for a remittitur because (1) the issue was not addressed in CYA's motion papers and (2) the issue should have been raised *before* the trial court denied CYA's motions. The trial court did not abuse its discretion.

D.  *Attorney Fees and Costs*

CYA seeks reversal of the award of attorney fees and costs on the ground that the jury's determination of liability is not supported by substantial evidence. Because we have concluded that the evidence supports the verdict, there is no basis to set aside the award of fees and costs.

## III

## DISPOSITION

The judgment is affirmed.

Rothschild, J., concurred. Vogel, J., concurred in judgment only.