53 Cal.Rptr.3d 558 (2007)
146 Cal.App.4th 63
Charlene J. ROBY, Plaintiff and Respondent,
v.
McKESSON HBOC et al. Defendants and Appellants.
Nos. C047617, C048799.
Court of Appeal of California, Third District.
December 26, 2006.
*560 Howard Rice Nemerovski Canady Falk & Rabkin, Jerome B. Falk, Jr., Linda Q. Foy, Jason M. Habermeyer, San Francisco; Fitzgerald, Abbott & Beardsley and Sarah E. Robertson, Oakland, for Defendants and Appellants McKesson Corporation and Karen Schoener.
Riegels Campos & Kenyon and Charity Kenyon, Sacramento; Christopher H. Whelan, Gold River; The deRubertis Law Firm and David M.. deRubertis, Woodland Hills, for Plaintiff and Respondent.
Certified for Partial Publication.[*]
*559 BUTZ, J.
Plaintiff Charlene J. Roby was a stellar employee of defendant McKesson HBOC, Inc. (McKesson)[1] for 25 years until she developed panic disorder in 1998, which caused her to start missing substantial time from work. Two years later, McKesson fired Roby for abusing its attendance policy, although many of her absences were attributable to her psychiatric disability.
The jury "threw the book" at McKesson. It awarded Roby millions of dollars in compensatory damages for wrongful discharge in violation of public policy, as well as harassment, disparate treatment, and discrimination/failure to accommodate under the California Fair Employment and
Housing Act (FEHA) (Gov.Code, § 12900 et seq.).[2] The jury rendered a separate verdict finding Roby's supervisor, Karen Schoener, liable for harassment. In a second phase of the trial, the jury levied a $15 million punitive damage award against McKesson and $3,000 against Schoener.
McKesson does not challenge the verdict insofar as the jury found it liable for wrongful termination, disability discrimination, and disparate treatment. McKesson and Schoener do challenge the harassment verdict as unsupported by substantial evidence. Both defendants also claim that reductions in the compensatory damage award are necessary and that the punitive damage award should be stricken or reduced.[3]
We shall conclude that the judgment awards duplicative noneconomic damages based on alternative theories of liability for the same wrong, requiring a downward adjustment. We shall also strike the harassment awards against McKesson and Schoener for insufficiency of the evidence. Finally, while we find the evidence sufficient to support punitive damages, we conclude that a substantial reduction in the size of the award is necessary to comport with constitutional constraints.
We shall thus reduce both the compensatory and punitive damage awards and affirm the judgment as modified.

FACTUAL BACKGROUND
In accordance with well-settled principles of appellate review, we summarize *561 the facts in the light most favorable to the prevailing party (respondent herein), resolving all conflicts in the evidence and all legitimate and reasonable inferences that may arise therefrom in favor of the judgment. (Weeks v. Baker & McKenzie (1998) 63 Cal.App.4th 1128, 1137-1138, 74 Cal.Rptr.2d 510 (Weeks).)
McKesson is a large corporation involved in the worldwide distribution of pharmaceuticals and other health care products. Roby worked as a customer service support liaison for McKesson's West Sacramento Distribution Center. She had been an employee of McKesson for 25 years, with good attendance and an excellent performance record until she developed panic disorder in early 1998.
Panic disorder is a psychiatric condition that puts the patient in an extreme state of fear, which seems to come from "out of the blue." Symptoms can include extreme discomfort, heart palpitations, shortness of breath, dizziness, and feelings of unreality or depersonalization. The first time Roby experienced one of these episodes, she thought she was having a heart attack and was rushed to the emergency room. She ultimately learned it was a psychiatric problem and she was put under the care of Kaiser psychiatrist Dr. Joseph Schnitzler on January 6, 1998.
When Roby had a panic attack, she would experience physical symptoms such as difficulty breathing, uncontrollable shaking, and scratching or picking at her arms until they bled. She would also experience head sweating to the point where her hair was "wringing wet." Moreover, the medications she was taking for her condition caused her to develop an unpleasant body odor that embarrassed her.
When Roby had a panic attack, her symptoms were "very obvious" to fellow workers. Her supervisor Alan Grover would typically send her outside on a break and try to calm her down. He would send a coworker out to check on Roby and make sure she was all right.
Grover manifested awareness that Roby was suffering from panic disorder. He and McKesson employee Luan Chew frequently discussed Roby's condition and the medications that were being used to address it. On four or five occasions, Chew informed Grover that Roby had stayed home because of a panic attack. Grover became concerned that it was affecting her job.
In April 1999, Karen Schoener became Roby's supervisor, replacing Grover, who received a promotion. Grover told Chew he was greatly concerned about Schoener becoming Roby's supervisor because there was already great animosity between the two.
In late 1998, McKesson instituted a new, stricter "90-day rolling" attendance policy, which caused a great deal of confusion among employees. Under the policy, an employee could be terminated if she accumulated too many "occasions" within a specified period. Absences without 24hour advance notice were considered occasions. Thus, if an employee woke up ill and called in sick, that could be counted as an occasion, even if she was entitled to take the day off as sick leave or vacation. Tardiness was counted as a half-occasion. However, if an employee had a clean record with no occasions for the next 30 days following the 90-day period, the first occasion would "drop off and not be counted against her.
If an employee received two occasions within a 90-day period, she would receive an oral warning on the third occasion. Another three occasions during a rolling 90-day period within six months would result in a written warning. One more occasion within 30 days would generate a *562 second written warning. Two more occasions after the written warnings would result in termination.
Although McKesson allowed employees to take excused time off under the federal Family and Medical Leave Act of 1993 (the FMLA) (29 U.S.C. §§ 2601-2654; 29 C.F.R. §§ 825.100 to 825.800), absences were counted as occasions unless the employee specifically requested FMLA paperwork. McKesson's employee handbook contained no explanation of an employee's FMLA rights.
Except for one; five-day absence for which she filled out FMLA paperwork, Roby's absences were always treated as occasions, regardless of the reason. On the other hand, McKesson treated other employees far more leniently. Jamie Steckman, for example, had asthma. When she had asthma attacks, she was rarely able to give 24 hours' advance notice of absence. Yet when she missed 15 to 20 days from work due to asthma attacks, they were all treated as one occasion. Luan Chew took off several weeks after suffering a hand injury, yet was never charged with an occasion. Roby's complaints to her supervisors that she was not being treated the same as other sick and injured employees were met with indifference.
Schoener made no effort to conceal her dislike of Roby. She did not return Roby's greetings and would sometimes turn her back on her. She referred to Roby's job as a "no-brainer." Once a month she would put a McDonald's apple pie on all of her subordinates' desks except Roby's. She would bring back trinkets from her vacations and give them to every coworker except Roby. She made Roby cover the phones during the office Christmas party. She would loudly reprimand Roby in front of her colleagues. Schoener made negative comments about Roby's body odor and sometimes showed a look of disgust as Roby walked by.
In 1999, Roby was absent on January 19, February 8 and March 31 and received a disciplinary warning on April 2, signed by supervisor Diane Saamer. Roby told Saamer the absences were related to her panic disorder, and that she was trying to get it stabilized. Saamer appeared sympathetic, but retired from McKesson soon thereafter.
In response to concerns from coworkers, Roby brought in a note from Dr. Schnitzler dated April 28,1999, stating that panic disorder was not contagious. She continued to take days off to see Dr. Schnitzler and for therapy sessions. On June 8, 1999, Roby had a panic attack in the parking lot and took the day off as vacation. The same day she received a written warning signed by Schoener for accumulating four more absences within a 90-day period. Roby received a final written warning on October 22, after she took days off on July 27 to 28 and October 18, even though the July absences were accompanied by a note from Dr. Schnitzler verifying that she was ill and unable to work.
Despite the October 22 notice, Schoener told Roby that if she could make it to January 18, 2000, without any occasions, her attendance record would be cleared and she would gain a new start. Roby reached the January target date without any occasions. But when she displayed delight that she had "made it" and was not going to be fired, Schoener just looked at her without responding.
After unscheduled absences on February 25 and April 11, 2000, Roby was called into Grover's office on. April 13. McKesson supervisors Christopher Rafter and Grover told Roby she was subject to termination for abuse of the absence program. Roby expressed surprise, recounting *563 Sehoener's assurances that if she made it until January, she would get a new start. Schoener advised Rafter and Grover that her remarks had been misinterpreted. Roby also complained that the absence policy was not being applied fairly since other employees suffering from medical conditions were given more leeway. She noted that fellow worker Bobbe Schenken had all her absences counted as one occasion when she had gall bladder surgery. Roby was suspended with pay and told that her supervisors would investigate the facts and let her know their final decision.
On April 14, Rafter and Grover telephoned Roby to tell her she was terminated. Roby protested that her April 11 absence was related to her panic disorder and again complained that she was not treated the same as other employees when it came to the absence policy. Roby filed a written grievance setting forth the same complaints and asserting that her absences during the last 12 months were all related to "[her] illness on file." Grover confirmed Roby's termination in a letter of April 17, 2000.
McKesson's "investigation" consisted of nothing more than counting up the number of Roby's absences and reaffirming its decision to fire her. In upholding the termination, McKesson did not consider whether Roby's absences would be excused under the FMLA, since she had filled out FMLA paperwork in only one instance.
Roby was financially and emotionally devastated as a result of the termination. She depleted her savings, lost her medical insurance, went without treatment for months, became suicidal and developed agoraphobia. In July 2001, the Social Security Administration declared her totally disabled. She now lives on disability payments from Social Security.

PROCEDURAL HISTORY
The case was tried to a jury in March and April of 2004 on causes of action for common law wrongful discharge in violation of public policy, as well as FEHA statutory claims for disparate treatment based on mental disability (§ 12940, subd. (a)), disability discrimination/failure to accommodate (§ 12940, subd. (m)) and hostile work environment/harassment (§ 12940, subd. (j)). The chart below summarizes the special verdicts:

 Wrongful Discharge-McKesson
 ----------------------------------------
 Damages
 ----------------------------------------
 Past economic loss $ 605,000
 ----------------------------------------
 Future economic loss 706,000
 ----------------------------------------
 Past noneconomic loss 250,000
 ----------------------------------------
 Future noneconomic loss 250,000
 ________________________________________
 Total: $1,811,000
 ----------------------------------------
 Disparate Treatment-McKesson
 ----------------------------------------
 Damages
 ----------------------------------------
 Past economic loss $ 605,000
 ----------------------------------------
 Future economic loss 706,000
 ----------------------------------------
 Past noneconomic loss 200,000
 ----------------------------------------
 Future noneconomic loss 100,000
 ________________________________________
 Total: $1,611,000
 ----------------------------------------
 Hostile Work Environment/Harassment-McKesson
 ----------------------------------------
 Damages
 ----------------------------------------
 Past noneconomic loss $ 300,000
 ----------------------------------------
 Future noneconomic loss 300,000
 ________________________________________
 Total: $ 600,000
 ----------------------------------------
 Hostile Work Environment/Harassment-Karen Schoener
 ----------------------------------------
 Damages
 ----------------------------------------
 Past noneconomic loss $ 250,000
 ----------------------------------------
 Future noneconomic loss 250,000
 ----------------------------------------

*564
 Total: $ 500,000
 ________________________________________
 Disability Discrimination/Reasonable
 Accominodation-McKesson
 ----------------------------------------
 Damages
 ----------------------------------------
 Past economic loss $ 605,000
 ----------------------------------------
 Future economic loss 706,000
 ----------------------------------------
 Past noneconomic loss 400,000
 ----------------------------------------
 Future noneconomic loss 400,000
 ________________________________________
 Total: $2,111,000
 ----------------------------------------

Because the jury also found that Schoener and McKesson were guilty of malice, oppression or fraud, the case proceeded to a punitive damage phase, wherein the jury awarded $15 million in punitive damages against McKesson and $3,000 against Schoener.
The trial court entered judgment for $3,511,000 in compensatory damages against McKesson and $500,000 against Schoener. Defendants' motions for new trial and for judgment notwithstanding the verdict were denied. However, owing to Roby's concession that the jury's award for past economic damages included the future value of the same loss, the order denying defendants' posttrial motions included a $706,000 reduction in the verdict "[b]y stipulation of the parties."

DISCUSSION[**]

III. Sufficiency of the Evidence to Support the Harassment Verdict
The jury found both defendants liable for hostile work environment/harassment, awarding $600,000 against McKesson and $500,000 against Schoener. Defendants contend these verdicts are not supported by substantial evidence. For the reasons that follow, we agree.

A. Standard of Review
Defendants suggest the standard of review is de novo because this is a case in which the "'"historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant legal] standard....'"" (People v. Louis (1986) 42 Cal.3d 969, 984, 232 Cal.Rptr. 110, 728 P.2d 180.) However, both the cases they cite (Louis and Trujillo v. North County Transit Dist. (1998) 63 Cal.App.4th 280, 284, 73 Cal.Rptr.2d 596) were those in which the court was called upon to interpret a statute. Obviously, where the facts are undisputed and the question turns upon statutory interpretation, the issue is one of law, calling for de novo review. (E.g., International Federation of Professional & Technical Engineers v. City and County of San Francisco (1999) 76 Cal. App.4th 213, 224, 90 Cal.Rptr.2d 186.)
This case does not require us to interpret a statute. The question with which we are confronted is whether the evidence supports a factual finding by the jury that Schoener and McKesson were guilty of unlawful harassment based upon a hostile work environment. Hence, the standard of review is that of substantial evidence. (See Hope v. California Youth Authority (2005) 134 Cal.App.4th 577, 589, 36 Cal. Rptr.3d 154 (Hope).)
In applying the substantial evidence test, "'"the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact."'" (Franck v. Polaris E-Z Go Div. of Textron, Inc. (1984) 157 Cal.App.3d 1107, 1114, 204 Cal.Rptr. 321, quoting Foreman & Clark Corp. v. Fallon (1971) 3 Cal.3d *565 875, 881, 92 Cal.Rptr. 162, 479 P.2d 362.) However, "`[substantial evidence ... is not synonymous with "any" evidence.' Instead, it is "'"substantial" proof of the essentials which the law requires.'" [Citations.] The focus is on the quality, rather than the quantity, of the evidence. "Very little solid evidence may be "substantial," while a lot of extremely weak evidence might be "insubstantial."' [Citation.] Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence." (Roddenberry v. Roddenberry (1996) 44 Cal.App.4th 634, 651, 51 Cal.Rptr.2d 907.)

B. HarassmentLegal Principles
The FEHA states that "[i]t shall be an unlawful employment practice ... [¶] ... [t] ... [f]or an employer, ... or any other person, because of .. . mental disability, [or] medical condition, ... to harass an employee." (§ 12940, subd. (j)(1).)
Although the Hope case dealt with a claim of harassment based on sexual orientation rather than mental disability, the principles set forth in Hope are equally applicable here. (Hope, supra 134 Cal. App.4th at p. 588, 36 Cal.Rptr.3d 154.)
"`[A]n employee claiming harassment based upon a hostile work environment must demonstrate that the conduct complained of was severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their [mental disability].... The working environment must be evaluated in light of the totality of the circumstances: "[W]hether an environment is `hostile' or `abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."' (Miller v. Department of Corrections (2005) 36 Cal.4th 446, 462, 30 Cal.Rptr.3d 797, 115 P.3d 77....) [¶] `In determining what constitutes "sufficiently pervasive" harassment, the courts have held that acts of harassment cannot be occasional, isolated, sporadic, or trivial, rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature.' (Fisher v. San Pedro Peninsula Hospital (1989) 214 Cal.App.3d 590, 610, 262 Cal.Rptr. 842. ...) [¶] The harassment must satisfy an objective and a subjective standard. `"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiffs position, considering `all the circumstances.' .. ."' (Miller v. Department of Corrections, supra, 36 Cal.4th at p. 462, 30 Cal.Rptr.3d 797, 115 P.3d 77.) .. . Put another way, `[t]he plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that [he] was actually offended.' (Fisher v. San Pedro Peninsula Hospital, supra 214 Cal.App.3d at pp. 609-610, 262 Cal.Rptr. 842, fn. omitted.)" (Hope, supra 134 Cal. App.4th at p. 588, 36 Cal.Rptr.3d 154.)

C. Application
Where the harassment is perpetrated by a supervisor, the employer is vicariously liable, regardless of whether the employer was aware, or should have been aware of it. (Chin, supra, ¶ 10:60.5, p. 10-9.) In this case, Roby's only alleged harasser was her supervisor, Karen Schoener.
Our review of the record yields the following behavior by Schoener which could *566 conceivably support a claim of disability harassment: (1) she sometimes placed apple pies and small gifts on every subordinate's desk except Roby's; (2) she made Roby document all of her phone calls and made her cover the phones during the office Christmas party; (3) Schoener would often snub her at staff meetings and did not return her "good morning" greetings; (4) she once made a "throat slash" gesture when Roby was on the phone with a client and then loudly reprimanded Roby in front of her coworkers; (5) she referred to Roby's job as a "no-brainer"; (6) she once told Roby her arm digging and heavy sweating was "disgusting"; (7) even though Roby advised her that the unpleasant body odor was related to the medication she was taking for her condition, Schoener showed "no compassion," telling her instead that she needed to bathe and shower more frequently; and (8) Roby came to work one morning to find soaps, shampoos and deodorants had been placed on her desk. Roby was "crushed," but Schoener did nothing.
In Reno v. Baird (1998) 18 Cal.4th 640, 657, 76 Cal.Rptr.2d 499, 957 P.2d 1333 (Reno), the state Supreme Court relied on the distinction between discrimination and harassment under the FEHA in concluding that supervisory employees may be held liable for the latter, but not the former. Quoting from Janken v. GM Hughes Electronics (1996) 46 Cal.App.4th 55, 63-65, 53 Cal.Rptr.2d 741, the court explained: "`[H]arassment consists of a type of conduct not necessary for performance of a supervisory job. Instead, harassment consists of conduct outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives. Harassment is not conduct of a type necessary for management of the employer's business or performance of the supervisor employee's job. [Citations.]" [¶] ... [¶] We conclude, therefore, that the Legislature intended that commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment. These are actions of a type necessary to carry out the duties of business and personnel management. These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment. Harassment, by contrast, consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management.'" (Reno, supra, 18 Cal.4th at pp. 645-647, 76 Cal.Rptr.2d 499, 957 P.2d 1333, italics added.)
Application of these principles mandates the conclusion that most of the alleged harassment here was conduct that fell within the scope of Schoener's business and management duties. Acts such as selecting Roby's job assignments, ignoring her at staff meetings, portraying her job responsibilities in a negative light, or reprimanding her in connection with her performance, cannot be used to support a claim of hostile work environment. While these acts might, if motivated by bias, be the basis for a finding of employer discrimination, they cannot be deemed "harassment" within the meaning of the FEHA. (Reno, supra, 18 Cal.4th at p. 646, 76 Cal.Rptr.2d 499, 957 P.2d 1333.)
When Reno-protected conduct is sifted out, what we have left is evidence that Schoener treated Roby with general scorn *567 and contempt and failed to show any sympathy for her disability. This is not sufficient to create liability for harassment based on a hostile work environment.
The FEHA is not intended to, protect employees from rude, boorish, or obnoxious behavior by their supervisors. In order to constitute actionable harassment, the evidence must show that "`the workplace is permeated with "discriminatory intimidation, ridicule, and insult" ... that is "sufficiently severe or pervasive to alter the conditions of the victim's employment" ....'" (Birschtein v. New United Motor Manufacturing, Inc. (2001) 92 Cal. App.4th 994, 1000, 112 Cal.Rptr.2d 347, quoting Harris v. Forklift Systems, Inc. (1993) 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 301 (Harris), italics added.)
Thus, no matter how unpleasantly Schoener may have behaved toward Roby, her conduct cannot be deemed harassment unless it was based on and directed towards Roby's mental disability. The conduct must not only be severe or pervasive, it must also be tinged with discriminatory animus. (See Harris, supra, 510 U.S. at p. 22, 114 S.Ct. at p. 371, 126 L.Ed.2d at p. 302; see also Lyle v. Warner Brothers Television Productions (2006) 38 Cal.4th 264, 279, 42 Cal.Rptr.3d 2, 132 P.3d 211 (Lyle).)
For example, in Weeks, supra, 63 Cal. App.4th 1128, 74 Cal.Rptr.2d 510, the court found substantial evidence of sexual harassment where the plaintiffs supervisor "reached into [her] breast pocket, gestured as if to cup her breasts in his hands, touched her buttocks[,] quizzed her about the wildest thing she had ever done, [and] pulled [the plaintiffs] shoulders back to `see which breast [wa]s bigger.'" (Id. at p. 1147, 74 Cal.Rptr.2d 510.) In Hope, a sexual orientation harassment case, the court upheld a jury finding of harassment where the plaintiffs supervisor and coworkers regularly subjected him to a torrent of derogatory remarks and epithets directed toward his homosexuality, calling him a "motherfuckin' faggot," "homo," and "faggot ass motherfucker," while committing deliberate acts of cruelty and mistreatment on the job. (Hope, supra, 134 Cal.App.4th at pp. 589-591, 36 Cal.Rptr.3d 154.)
There is nothing remotely approaching that type of conduct here. With the exception of Schoener's occasional negative comments about Roby's sweating and body odor, none of the behavior asserted to be harassment was colored by discriminatory animus. But even those comments must be viewed in context. The record showed that Roby's unpleasant body odor disturbed her fellow employees and therefore affected the work environment. Accordingly, Schoener's admonitions to Roby to take more showers or to bathe more frequently had a reasonable relationship to her management duties and cannot be classified as harassment. (Reno, supra, 18 Cal.4th at p. 647, 76 Cal.Rptr.2d 499, 957 P.2d 1333.)
Nor can Schoener's occasional comments that Roby's sweating and arm digging were "disgusting" be deemed substantial evidence of harassment. "`[M]ore than an episodic pattern of [disability] antipathy must be proven to obtain statutory relief. A hostile working environment is shown when the incidents of harassment occur in concert or with a regularity that can reasonably be termed pervasive.'" (Etter v. Veriflo Corp. (1998) 67 Cal.App.4th 457, 463, 79 Cal.Rptr.2d 33, quoting Lopez v. S.B. Thomas, Inc. (2d Cir.1987) 831 F.2d 1184, 1189, cited with approval in Faragher v. City of Boca Raton (1998) 524 U.S. 775, 787, fn. 1, 118 S.Ct. 2275, 2283, fn. 1, 141 L.Ed.2d 662, 676, fn. 1.) There is no evidence that Schoener ever referred to *568 Roby's panic disorder in derogatory terms, interfered with the breaks she needed when she experienced attacks, or engaged in a regular, pervasive pattern of conduct tormenting her on account of her mental disability.
While the evidence showed that Schoener obviously disliked Roby, shunned her, and showed no compassion for her condition, neither cold indifference nor lack of sensitivity toward a disabled employee can be alchemized into a claim of hostile work environment. If such were the case, virtually every case of disability discrimination could be parlayed into a supplementary damage claim for harassment.
Roby points to evidence that Schoener's behavior aggravated her symptoms and left her emotionally ravaged. But Roby, already emotionally frail from the severe effects of her psychological disorder, was highly susceptible to even the slightest display of antipathy. To be actionable an "`objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.' [Citations.] That means a plaintiff who subjectively perceives the workplace as hostile or abusive will not prevail under the FEHA, if a reasonable person in the plaintiff's position, considering all the circumstances, would not share the same perception." (Lyle, supra, 38 Cal.4th at p. 284, 42 Cal. Rptr.3d 2, 132 P.3d 211, italics added.) The "reasonable person" test is necessary to protect employers against claims that are frivolous or brought by hypersensitive employees. (See Andrews v. Philadelphia (3d Cir.1990) 895 F.2d 1469,1483.)
We conclude there is insufficient evidence to support the finding that Schoener engaged in discriminatory harassment within the meaning of the FEHA. Thus, the harassment verdict against McKesson also fails. Because it must be stricken entirely, we need not reach defendants' remaining arguments directed at the harassment verdicts.

DISPOSITION
The judgment in case No. C047617 is vacated. The trial court is directed to enter a new judgment in favor of defendant Schoener against Roby and in favor of Roby and against defendant McKesson in the sum of $1,405,000 in compensatory damages and $2 million in punitive damages. So modified, the judgment is affirmed, with each party bearing its own costs on this appeal.
The postjudgment order awarding Roby her attorney fees in case No. C048799 is affirmed. (See fn. 3, ante.) Roby is also awarded her costs on that appeal. (Cal. Rules of Court, rule 27(a).)
NICHOLSON, Acting P.J., and ROBIE, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976 and 976.1, only the introduction, the Factual Background, the Procedural History, part III of the Discussion and the Disposition of this opinion are certified for publication.
[1] McKesson HBOC changed its name to McKesson Corporation during the pendency of this litigation. McKesson is a Delaware corporation doing business in California.
[2] Undesignated statutory references are to the Government Code.
[3] McKesson filed a separate appeal (C048799) from the trial court's postjudgment award to Roby of $728,668.75 for attorney fees. We ordered the two appeals consolidated on June 22, 2005. However, McKesson's briefs do not raise any challenge to the attorney fee award. Based on this implicit concession that the postjudgment order is free from reversible error, we shall affirm it.
[**] See footnote *, ante.