Filed 4/30/14  Burger v. Meier CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ROBERT E. BURGER,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>DONNA K. MEIER, et al.,<br><br>　　　　Defendants and Appellants. | A139323<br><br>(Mendocino County<br>Super. Ct. No. SCUKCVG 11-58785) |

## I.  INTRODUCTION

This appeal arises out of a family dispute regarding ownership of a ranch.  Robert E. Burger (Bob) exercised an option to purchase the ranch from a trust established by his parents, Robert K. Burger (Robert) and Gladys Burger (Gladys).  But before the sale was completed, Bob's sister Donna Meier (Donna) exercised an option to purchase an undivided half interest in the ranch which she had obtained from Gladys after Bob exercised his option.  Shortly thereafter, Bob filed this action against Donna, Gladys and other family members.

After a non-jury trial, the court entered a judgment which, among other things, invalidated Donna's ownership interest in the ranch; granted Bob specific performance of his contract to purchase the entire ranch; and held Donna liable for damages for her intentional interference with Bob's contract to purchase the ranch.  Donna and Gladys appeal contending that there is insufficient evidence to support the judgment and that equity is on their side.  We affirm.

1

## II. STATEMENT OF FACTS

### A.    *Background: The Trust and Bob's Option*

In 1993, Robert and Gladys were living together on a 565 acre ranch near Boonville in Mendocino County (the Ranch). Robert had inherited the Ranch from his parents and he wanted it to remain in his family, intact with a single owner after his death. So he decided to have a family meeting to determine if any of his four children were interested in purchasing the Ranch and if they had the financial ability to do so. Bob and Donna both expressed an interest but only Bob had the financial ability. Donna suggested co-ownership but Robert insisted that he wanted a single owner. Donna was upset about the meeting both because she wanted the Ranch and because her father had asked about her financial situation.

In May 1993, Robert and Gladys established the Revocable Trust of Robert K. Burger and Gladys H. Burger (the Trust). Assets of the Trust estate were all designated as community property, and the Burgers' four children were designated as the beneficiaries to whom the assets would be distributed in equal shares upon the death of both trustors. The Ranch was designated as an asset of the Trust but was subject to a special provision which gave Bob the "option to buy from his sisters, or their issue, at its fair market value their interest" in the Ranch. The Trust further provided that "The purchase price shall be payable with a down payment of fifteen percent (15%) of the purchase price and the balance evidenced by a promissory note . . . ."

In June 1995, Robert and Gladys executed a First Amendment to the Trust which modified Bob's option to purchase the Ranch. Pursuant to the First Amendment, Bob had the right to exercise his option either during the life of the surviving spouse/trustor or for an 18-month period after the death of the surviving spouse/trustor. However, Bob's interest was subject to the surviving trustor's right to retain the residence on the Ranch for the remainder of his or her life. The pertinent language of the First Amendment stated:

"If the purchase is during the lifetime of the surviving Trustor, the surviving Trustor shall have the right to live in the residence on the property for the remainder of

2

his or her lifetime. . . . The purchase price shall be payable with a fifteen percent (15%) down payment, with the balance represented by a secured promissory note amortized over twenty (20) years . . . ."

In November 1997, Robert died and the Trust was divided in two pursuant to its terms; a Survivor's trust held Gladys' share of the community property, and the balance of the Trust estate was transferred into a Decedent's trust. As the surviving trustor, Gladys retained the right to revoke or amend the Survivor's trust but she did not have authority to revoke or amend the Decedent's trust.

## B.  *Family Reactions to Bob's Option*

In September 1999, Gladys shared her estate planning documents with her children; each received copies of the Trust, the First Amendment and their parents' wills. Donna was not surprised that Bob was given the option to purchase the Ranch, but she was frustrated and disappointed because she wanted an ownership interest in the Ranch. Over the next several years, the family had many discussions about Bob's plans for the Ranch. During that period, Bob and his wife Mary lived near Redding, where they had a small ranch. During the winter months, Bob ran cattle near Igo, which is west of Cottonwood, a town near his home. In the spring through the fall, Bob ran his cattle at the Ranch and stayed there for two or three days every week or two.

By 2008, Bob's siblings were openly questioning him about his plans for the Ranch. They also objected to the idea that Bob's stepchildren might acquire an ownership interest in the Ranch and they demanded that he make estate plans that would preclude that from happening. By this time, Gladys, who was in her 80's but still very independent, felt it would be better for her if one or more of her children moved onto the Ranch property. In light of Bob's apparent disinterest, Gladys decided that Donna and her husband should move to the Ranch. Donna's husband, Robert Meier, had approached Gladys about buying part of the Ranch. He assured her that they would move onto the property if they were allowed to purchase an interest and he and Gladys discussed possible sites for a home.

3

Some time after her discussion with Robert Meier, Gladys told Bob that she was contemplating selling her half interest in the Ranch to Donna. Bob objected to that idea, not only because it was contrary to his own expectations but also because it was inconsistent with Robert's wishes. According to Bob, Gladys agreed to "drop it."

During the second half of 2008, Donna and her husband had several conversations with Bob during which they tried but failed to convince him to allow them to purchase an interest in the Ranch. At a family meeting in May 2009, Bob's sister Mary accused him of bullying Gladys and chastised him for failing to respect their mother's wishes to sell her half interest in the Ranch to Donna.

## C.    *Bob's Contract to Purchase the Ranch*

In early June 2009, Gladys told Bob that Donna was pressuring her and making her uncomfortable and she asked him to exercise his option so the matter would be "off the table." She asked Bob to make an appointment for them to meet with her estate attorney, Myrna Oglesby, so that he could exercise his option while she was still alive. After Bob made the appointment, Gladys told him that Donna wanted to come to the meeting and that she would bring Gladys from the Ranch.

On June 18, 2009, Gladys, Bob and Donna had a meeting at Oglesby's office. Donna was antagonistic during the meeting; she expressed concern about the value of her inheritance and made several suggestions for alternatives to the Trust, all of which Oglesby rejected. Oglesby asked Gladys how she felt about selling the Ranch to Bob and Gladys responded that it was "time." Bob executed his option and Gladys acknowledged it in her capacity as trustee. Oglesby agreed to arrange for an appraisal in accordance with the terms of the Trust.

On June 19, 2009, Oglesby sent a letter to Richard Thomas, the probate referee for Mendocino County, in which she requested an appraisal of the Ranch. Oglesby told Thomas that the Trust gave Bob an option to purchase the Ranch. She also advised him that Gladys had the "right to continue to live there for her lifetime after the purchase." Oglesby requested that Thomas complete an appraisal in order to determine "the present

4

value of the entire real property . . . and also, separately but in the same schedule . . . the value of Gladys' life estate percentage."

At trial, Oglesby acknowledged that her instructions to the probate referee were erroneous because she told Thomas that Gladys had a life estate in the entire Ranch when in fact the First Amendment created a life estate interest only in the residence on the Ranch. Oglesby also testified that she did not realize her error until "much later" in time. When pressed for a time frame as to when this discovery was made, Oglesby could not provide one.

On July 2, 2009, Gladys, Bob and Donna attended another meeting at Oglesby's office. The purpose of the meeting was for Gladys to sign a Second Amendment to the Trust in order to update her healthcare directives and change the order of the successor trustees, although Bob remained the first successor trustee. During that meeting, Donna made suggestions about changing the Trust terms and asked Oglesby what conduct would constitute an "attack on a Trust."

On July 7, 2009, Thomas completed an appraisal which provided two values for the Ranch. First, Thomas determined that the fair market value of the Ranch was $990,000. Second, he concluded that the fair market value when discounted for Gladys' life estate was $840,000. Thomas' second calculation, the value that was discounted to reflect the life estate, was based on the erroneous assumption that Gladys' life estate applied to the entire Ranch.

On July 9, 2009, Oglesby sent a copy of the appraisal to Gladys with a letter which stated, in part: "The amendment to your trust does not specify which value is appropriate to be used for Bob's purchase of the property, but I believe in fairness that it would be the lower figure, since he is purchasing the property during your lifetime. That, however, is not my decision to make, but yours."

In her July 9 letter, Oglesby told Gladys that she would open an escrow to facilitate the sale of the Ranch to Bob once Gladys made a decision about the purchase price. However, Gladys did not immediately respond to Oglesby's request for a decision about the purchase price. Nor did she respond to a follow up inquiry that Oglesby sent in

October 2009.  Instead, for several months after Oglesby sent the appraisal report to Gladys, the Burger family discussed and often disagreed about the appropriate purchase price for the Ranch.

Donna made her opinion clear less than two weeks after the appraisal was completed.  On July 18, she and her husband Robert Meier went to the Ranch and told both Gladys and Bob that Bob should pay $990,000 to buy the Ranch.  Robert Meier told Gladys and Bob that he would gladly pay $1,000,000 for the Ranch.

Bob testified that every time he saw Donna and Robert, they campaigned for a right to purchase an interest in the Ranch.  In the late winter or early spring of 2010, Bob and his wife were at the Ranch when Donna and Robert came for a visit.  Again they tried to convince Bob to let them purchase a half interest in the Ranch, promising to only use it for recreation and that Bob could still run cows there.  Bob reiterated that he was not interested in joint ownership.  Although Gladys was present during that encounter, she did not participate in the discussion and it appeared to Bob that she still had not made a final decision about the price of the Ranch.  However, this encounter led Bob to conclude that he should take action, so he called another meeting at Oglesby's office.

On April 26, 2010, Gladys, Bob and Donna attended a meeting at Oglesby's office.  At that meeting, Donna asked Oglesby whether Bob's option had given him the right to purchase the entire Ranch and Oglesby responded that it did.  The group discussed possible alternatives which would allow Donna to acquire an interest or to move onto the Ranch, but Bob and Donna could not agree on any of those alternatives.  There was also discussion about which appraisal price to use, but ultimately no agreement.  Nevertheless, Bob had brought with him a certified check for $130,000 which represented 15 percent of $840,000.  Oglesby told Bob to use the money to open an escrow at Redwood Empire Title Company, which he did later that same day.  Opening escrow did not resolve family disagreements regarding the future of the Ranch.

During family meetings in May and June of 2010, Donna and Mary chastised their brother for refusing to share ownership of the Ranch with Donna.  Bob testified that by June, Gladys had made it clear to him that she wanted Donna to live at the Ranch, but she

6

also said she would do what her husband had wanted her to do. According to Donna, by June 2010, Gladys had also made it clear that Bob should pay the higher appraisal value for the Ranch because she viewed the lower price as charging her rent.

Gladys testified that she had in fact objected to the lower appraisal because she viewed it as paying rent. However, Gladys could not recall when she shared this opinion with her attorney Myrna Oglesby. When asked whether she "ever" told Bob she wanted him to pay $990,000 for the Ranch, Gladys testified that she "told him the lesser amount was ridiculous so he must have assumed that the other price was right."

At trial, Oglesby acknowledged that by mid 2010, she was aware that the Burger family had been unable to resolve their disagreement about which appraisal value to use as the purchase price for the sale to Bob; Bob was prepared to close the deal using the lower appraisal value and Gladys thought he should pay the higher price. However, Oglesby did not advise Gladys to file a petition for instructions to resolve the dispute. Nor did she ever convey a demand to Bob to either pay the higher appraisal price or forfeit his right to purchase the entire Ranch from the Trust.

**D.** *The Third Trust Amendment and Donna's Option*

In April or May of 2011, Bob told Gladys that he was working on his own estate plan and would be able to close escrow on the Ranch in the next few months. Gladys did not object to this plan. Nor did she ever mention she was considering changing her trust. Bob was under the impression that Gladys still had not made a final decision about the price of the Ranch.

In June of 2011, Gladys' daughter Mary arranged another meeting with Oglesby. Mary testified that she scheduled the meeting because she was concerned about her mother who had become very frustrated about the unresolved disputes over the Ranch. Mary gave Gladys a list of specific questions and concerns to use as a tool to prepare for the meeting. One set of questions pertained to the scope of Gladys' authority to change the terms of the Trust. Mary had shared her list with Donna and the two sisters discussed it in an exchange of e-mails. Donna asked Mary to remind their mother that "this is a REVOCABLE trust." In response, Mary assured Donna that "I will remind her the trust

7

is revocable and life brings changes." Donna also warned Mary that Oglesby would likely resist changing the Trust and that it might be necessary to find a new lawyer for their mother.

On June 6, 2011, Mary accompanied Gladys to the meeting with Oglesby. During that meeting, Oglesby told Gladys she had the power to amend her survivor's trust to give Donna an option to purchase her one-half interest in the Ranch. Mary testified that Oglesby also told Gladys there was no "binding contract" between Bob and the Trust. During the meeting Gladys expressed concern Bob would be angry. According to Mary, Oglesby responded that "he wouldn't sue his mother, would he?"

After the June 2011 meeting, Oglesby drafted a Third Amendment to the Trust which gave Donna an option to purchase an undivided one-half interest in the Ranch. Gladys signed the Third Amendment on June 14, 2011, and then asked Mary to call a family meeting to share the news. The meeting was held on July 15, 2011, at Oglesby's office so that Oglesby could explain the terms of the Third Amendment to the family.

Bob was shocked to learn that Gladys had amended the Trust to give Donna an option to buy half the Ranch and he requested time to seek legal advice. Oglesby suggested that the parties not take any further action until mid-September. At trial, Donna testified that she was also surprised by the news that Gladys had amended the Trust to give her an option to purchase an interest in the Ranch and she also acknowledged that Bob had asked for time to seek legal advice. Nevertheless, Donna elected not to wait to exercise her option because she "wanted to get it over and done with."

On July 19, 2011, Donna exercised her option, agreeing to pay $495,000 for an undivided one-half interest in the Ranch. On July 26, Gladys executed a deed in her capacity as trustee, conveying the one-half interest to Donna. That same day, Donna

deeded the property to herself and her husband Robert Meier. The Meiers made a down payment of $74,250 and gave Gladys a secured note for the balance.[1]

## E.    *Bob's Lawsuit*

On August 17, 2011, Bob filed the present action. Around that time, or shortly thereafter, the parties and Oglesby discovered that the 2009 appraisal was based on the erroneous assumption that Gladys had a life estate in the entire Ranch and not on the actual fact that Gladys' right was only to retain the residence for her life.

In September 2011, Gladys demanded that Bob vacate the Ranch and remove his cattle. To forestall eviction, Bob closed escrow on the undivided one-half interest in the Ranch that was held in his father's decedent's trust, without prejudice to exercise the rights he had asserted in his lawsuit.

## F.    *The Trial Court's Decision and Judgment*

In late January 2013, a three-day court trial was conducted before the Honorable Cindee F. Mayfield. After the completion of the trial and post-trial proceedings, the trial court filed a 13-page statement of decision on May 24, 2013.

The court's thorough and well-reasoned statement of decision contains extensive findings of fact and law supporting the judgment which holds, among other things, that (1) Donna and her husband Robert Meier do not have a valid ownership interest in the Ranch; (2) Gladys in her capacity as trustee must specifically perform the contract to sell the entire Ranch to Bob; and (3) Donna is liable to Bob for damages caused by her intentional interference with Bob's contract to purchase the Ranch. Several of the court's findings in support of the judgment are directly pertinent to this appeal.[2]

---

[1] Gladys forgave the Meiers' obligation to make principal and interest payments on the note for September through December of 2011, which resulted in a gift of $10,421.72. She also excused them from making any further payments on the note until all litigation was resolved.

[2] In light of this fact, we are very troubled that appellants virtually ignore the trial court's statement of decision. For the record, we also agree with respondent that the factual summary in the Appellants' Opening Brief is argumentative and incomplete.

9

The trial court's findings supporting the conclusion that Bob is entitled to specific performance include the following:  (1) Bob entered into a binding contract to purchase the Ranch from the Trust pursuant to the terms set forth in the First Amendment; (2) Gladys' life estate interest in the residence on the Ranch should have been factored into the purchase price of the Ranch; (3) Gladys' performance was not excused by any breach of the contract allegedly committed by Bob; (4) Gladys did not have the legal authority to amend the Trust in a manner which interfered with Bob's right to purchase the Ranch; and (5) Gladys breached the Trust's contract with Bob by selling a half interest in the Ranch to Donna and Robert Meier.

In concluding that Donna intentionally interfered with Bob's contract, the trial court found, among other things, that (1) Bob entered into a valid contract to purchase the Ranch from the Trust; (2) Donna knew that Bob exercised his option to purchase the Ranch; (3) Donna elected to exercise the option which was created by the Third Amendment "with full knowledge that doing so would prevent Bob from buying the entire Ranch"; (4) By exercising the option, Donna actually disrupted Bob's contractual relationship with the Trust; and (5) Bob sustained damages as a result of Donna's conduct in the form of litigation and attorney fees incurred in this action.

## III.  DISCUSSION

### A.    *Issues Presented and Standard of Review*

Appellants challenge the sufficiency of the evidence to support the components of the judgment which establish that (1) Bob is entitled to specific performance, and (2) Donna intentionally interfered with Bob's contract.

"In reviewing a challenge to the sufficiency of the evidence, we are bound by the substantial evidence rule."  (*Turman v. Turning Point of Central California, Inc.* (2010) 191 Cal.App.4th 53, 58.)  "Under the substantial evidence test, ' "[t]he power of the appellate court begins and ends with a determination as to whether there is any

---

These tactical decisions are unwise at best and we urge appellants' counsel not to repeat them in the future.

substantial evidence, contradicted or uncontradicted," to support the trial court's findings. . . . "We must therefore view the evidence in the light most favorable to the prevailing party, giving [him] the benefit of every reasonable inference and resolving all conflicts in [his] favor. . . ." ' [Citations.] '[T]he focus is on the quality, not the quantity of the evidence. Very little solid evidence may be "substantial," while a lot of extremely weak evidence might be "insubstantial." ' [Citation.] Indeed, the testimony of a single witness may be sufficient. [Citation.]" (*Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 589.)

**B.     *Specific Performance***

In this court, appellants concede that the exercise of Bob's option gave rise to a binding contract for Bob to purchase the entire Ranch from the Trust. (See *Shomaker v. Osborne* (1967) 250 Cal.App.2d 887, 893.) Nevertheless, appellants maintain that Gladys was excused from performing because Bob breached the contract by (1) failing to open escrow in a timely manner and (2) refusing to make a deposit of 15 percent of the full value of the Ranch without any discount for Gladys' life estate. Alternatively, appellants contend that Bob should be denied specific performance because the equities favor appellants. We will separately address these three erroneous theories.

**1.     *Delay Opening Escrow***

The trial court made at least two findings that undermine appellants' claim that Bob materially breached the contract by failing to open an escrow account until more than nine months after the appraisal was completed.

First, the court found that the delay in opening escrow was caused primarily by Gladys. This finding is supported by substantial evidence. It was Gladys' attorney, Myrna Oglesby, who provided the appraiser with the incorrect information about the life estate which resulted in the $850,000 valuation. There is ample evidence that this erroneous valuation was the primary factor that caused the delay in setting a price and completing the sale of the Ranch to Bob. Aside from and in addition to Oglesby's error, Gladys herself failed to communicate a decision about price to either Oglesby or Bob in a

timely manner. Indeed, contrary to appellants' many representations on appeal, the evidence shows that Gladys never demanded that Bob pay a specific price for the Ranch.

Second, the trial court found that any delay in opening escrow that was attributable to Bob was not material. Again, substantial evidence supports this finding. The First Amendment gave Bob the option to purchase the Ranch at any time during Gladys' life or up to 18 months after her death. Furthermore, no provision of the Trust established a time frame for opening escrow or for finalizing the transaction after the option was exercised.

In addition, neither the Trust nor its First Amendment imposed an obligation to open an escrow on Bob. Nor is there any evidence that Gladys demanded or even asked Bob to open an escrow account. Rather, the evidence shows that Oglesby told both Gladys and Bob that she would open an escrow and that the reason that never happened was because Gladys never made a decision about the price.

Appellants ignore the trial court's findings and the substantial evidence that supports those findings. Instead, they contend that other evidence in the record establishes that the contractual obligation to open an escrow account fell squarely on Bob and that he breached that material obligation by failing to open an escrow "as soon as" the appraisal was completed. Their theory is that when Bob signed the notice that he had exercised his option, that notice became a part of the contract and created a "new term" which stated: "[A]s soon as the appraisal is received, an escrow will be opened at a title company in Ukiah, California, into which the undersigned will deposit all . . . funds to complete the purchase in accordance with the terms set forth in the attached First Amendment to Revocable Trust." Appellants interpret this language in the notice as imposing a contractual obligation on Bob to open an escrow "[a]s soon as" the appraisal was completed.

First, appellants fail to provide any authority for their contention that the language in the notice became a material term of Bob's contract to purchase the Ranch. Second, as is their habit, appellants ignore substantial evidence that is inconsistent with their argument. For example, the language in the notice does not expressly or implicitly

12

impose any burden on Bob to open the escrow, but instead simply states that an "escrow will be opened . . . ." In addition, appellants' strained and self-serving interpretation of this language in the notice is not consistent with the language in the Third Amendment which created an option that was unambiguously intended to give Bob significant flexibility in terms of deciding when to purchase the Ranch. Appellants' theory is also inconsistent with evidence that Oglesby, the lawyer who drafted the notice, expressly assumed responsibility for opening the escrow account on behalf of the Trust. Thus, on this record, the language in the notice does not undermine the trial court's finding that any delay in opening escrow that was attributable to Bob was not material.

Finally, appellants argue that the trial court erred by concluding that Bob reasonably relied on Oglesby's representation that she would open the escrow account. However, the court made no such finding, nor was it required to. The pertinent issue is whether the evidence supports the court's finding that Bob was not primarily responsible for the delay in opening escrow. In making that finding, the trial court did not err by attributing the delay caused by Oglesby's conduct to Gladys.

Oglesby was acting as the agent of the trustee when she provided the erroneous instructions to the probate referee from whom she requested the appraisal and when she made the representation that she would open an escrow. "Generally speaking, an attorney is the agent of the client [citation], and the client as principal is bound by the attorney's acts within the scope of the attorney's actual (express or implied) or apparent or ostensible authority, or by unauthorized acts ratified by the client." (1 Witkin, Cal. Procedure (5th ed. 2008) Attorneys, § 235, and authority cited therein.) Here, appellants do not identify any authority which even suggests that Gladys was not bound by the acts of her attorney in this context.

## 2. *The Escrow Deposit*

At trial, appellants argued that Bob breached the contract by refusing to make an escrow deposit based on the full appraisal value of the Ranch, i.e., the higher $990,000 figure. The trial court rejected this theory, finding that Bob did not have a contractual obligation to deposit 15 percent of the full appraisal value of the Ranch because Bob

13

exercised his option during Gladys' life.  The court found that Bob agreed to purchase the Ranch subject to his mother's life estate in the residence, and therefore he "had no duty to pay $990,000 for the Ranch because this price represented the fair market value of the property without considering Gladys' life estate."

Appellants challenge the trial court's finding that Gladys has a life estate in the residence on the Ranch.  They argue that the First Amendment did not reserve a life estate interest for the surviving spouse but instead only gave that survivor the right to live in the residence without having to pay rent.

" ' "[T]he primary rule in construction of trusts is that the court must, if possible, ascertain and effectuate the intention of the trustor or settlor." [Citation.]  "The intention of the transferor as expressed in the [trust] instrument controls the legal effect of the dispositions made in the instrument." [Citations.]  "The nature and extent of the rights retained by the trustor are to [be] measured by the four corners of the instrument." [Citation.]' [Citation.]" (*Aguilar v. Aguilar* (2008) 168 Cal.App.4th 35, 39.)

Here, the First Amendment gave Bob the right to exercise his option to purchase the entire Ranch during the life of the surviving trustor.  But it also qualified that right by providing that "the surviving Trustor shall have the right to live in the residence on the property for the remainder of his or her lifetime."  This language is not ambiguous; it conveys an intention to reserve on behalf of the surviving spouse, a life estate in the residence on the Ranch.  "A life estate is an estate whose duration is limited to the life of the person holding it or of some other person.  [Citation.]  'It is not an essential requisite to the giving of a life estate, that it be expressly declared to be such, nor that the term "life estate" shall be used.  The intention can as well be manifested by other words, referring to the estate conveyed and describing its characteristics, and if by that means the intention to vest a life estate, only, is shown, it will be as effectual as if it were expressly so stated.' [Citation.]" (*Estate of Smythe* (1955) 132 Cal.App.2d 343, 345-346.)

Appellants argue that their interpretation of the First Amendment as giving the surviving spouse the right not to pay rent is most consistent with the overriding intention of the trustors to treat all of their children equally.  Appellants do not actually articulate

14

their theory of equality; they do not explain how an interpretation of the Trust which diminishes the right of the surviving spouse from a life estate interest to a right not to pay rent results in a more equitable treatment of the beneficiaries. In any event, the very fact that Bob was the only child who was given the option to purchase the entire Ranch undermines appellants' theory that the trustors expressed an intention to treat every beneficiary exactly the same.

Appellants also contend the trial evidence shows "that it was the intent of the Trustors that each of their children should inherit an equal share of the Trust's assets." Specifically, appellants rely on Gladys' testimony that one reason she did not want to accept the lower appraisal figure was because it would not be fair to her other three children.

Extrinsic evidence of the trustors' intent is relevant only if the trust language is ambiguous. (Prob. Code, § 21102, subd. (c).) Assuming this was such a case, the relevant question is not what Gladys wanted for her children at the time of trial but, rather, whether the trustors intended to create a life estate in the residence on the Ranch when they executed the First Amendment. As best we can tell, Gladys never addressed that question at trial. However, Myrna Oglesby, the trust attorney who drafted the First Amendment on behalf of Robert and Gladys, described the right that was reserved to Gladys by that document as a life estate.

Indeed, as the trial court noted in its statement of decision, all of the parties assumed that Gladys had a life estate in the residence until shortly before trial when appellants first advanced their theory that the Third Amendment merely establishes a right for Gladys to live in the residence rent free. This new interpretation is not compelled by any evidence in this record. Furthermore, it is inconsistent with the settled rule of law that "[a] trust agreement should not be interpreted so as to deny or diminish a right reserved to himself by a trustor because the exercise of the right would destroy or lessen the benefits to a gratuitous beneficiary, unless such is the clear meaning of the trust document. [Citation.]" (*Estate of Cox* (1970) 8 Cal.App.3d 168, 199.)

15

Appellants intimate that, even if Gladys did have a life estate in the residence, Bob breached the contract by depositing only 15 percent of the $840,000 appraisal figure when he knew that figure was based on the erroneous assumption that the life estate interest included the entire Ranch. According to appellants, in 2010, Oglesby told Bob that the appraiser had made a mistake in estimating the value of Gladys' life estate. The record citations that appellants provide for this representation do not support it. Furthermore, the trial court made an express finding that all of the parties and Oglesby did not discover that the lower appraisal was based on an erroneous assumption before Bob filed this lawsuit. Unquestionably, that finding is supported by substantial evidence.

Finally, appellants contend that Bob was contractually required to deposit 15 percent of the higher appraisal because "Gladys refused to accept the lesser price and demanded that Bob pay the higher appraisal price . . . ." First, as reflected in our analysis above, the Trust did not give Gladys the right to unilaterally decide what price to charge Bob for the Ranch. Second, and as also discussed above, Gladys never actually demanded that Bob pay the higher price.

### 3. *Principles of Equity*

As noted above, the trial court found that Gladys breached the Trust's contract with Bob by selling an interest in the Ranch to Donna. (Citing *Crane v. East Side Canal & Irrigation Co.* (1935) 6 Cal.App.2d 361, 367.) The court also found that in light of that breach, Donna and Robert Meier held their interest in the Ranch as constructive trustees for Bob and were required to deed that interest back to the Trust so that the Trust could perform its contract with Bob. (Citing *Douglas v. Superior Court* (1989) 215 Cal.App.3d 155, 160; *Wachovia Bank v. Lifetime Industries, Inc*. (2006) 145 Cal.App.4th 1039, 1056.)

Without challenging these trial court findings, appellants maintain that Bob is not entitled to specific performance of his contract with the Trust for equitable reasons. As a general rule, in cases involving a contract for the transfer of land, there is a presumption that damages are an inadequate remedy; "historically, land is treated as unique, and specific performance will therefore be granted as a matter of course unless some other

16

equitable reason for denial is shown." (13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 28, pp. 318-319.)

Here, appellants contend that the trial court erred by granting Bob the remedy of specific enforcement because his contract with the Trust is not just or reasonable and the consideration is inadequate. There is authority that a court should not specifically enforce a contract against a party who has not received adequate consideration or if doing so would not be just and reasonable. (*Kaufman v. Goldman* (2011) 195 Cal.App.4th 734, 742, and authority cited therein.)[3] The trial court's resolution of such issues is reviewed on appeal for abuse of discretion. (*Peterson v. Hartell* (1985) 40 Cal.3d 102, 110.) We find no such abuse here.

Appellants' theory is that enforcing this contract against Gladys would be unfair because she "steadfastly" insisted that her intention was for Bob to pay the full appraised value of the Ranch so as not to charge her rent; she refused to accept Bob's "erroneous low-ball" offer in order to protect the interests of the other beneficiaries; and she is Bob's 86-year-old mother who should not be forced to sell him "the family ranch at a 'ridiculously' low price because she elected to live as long as possible in the home she has occupied for 38 years."

These characterizations of Gladys' actions and motivations are not only based on questionable and clearly argumentative interpretations of the trial evidence, they are irrelevant to the issue at hand. " 'The fairness of a bargain is to be viewed in the light of the circumstances as they existed at the time the bargain was struck and not at the time the parties seek to enforce the rights based upon their earlier contract.' [Citation.]" (*Kaufman v. Goldman, supra,* 195 Cal.App.4th at p. 742.)

_____

[3] These principles are also reflected in Civil Code section 3391, a statute appellants reference (but mistakenly refer to as section 2291) for the first time in the Appellants' Reply Brief.

At oral argument before this court, appellants' counsel intimated that the statement of decision is deficient because it does not contain express findings regarding these equitable issues. However, the record citations provided by counsel indicate that findings on these specific issues were never requested.

17

Nevertheless, we note for the record our firm rejection of appellants' persistent claim that Bob is somehow responsible for the fact that the appraiser made an erroneous "low-ball" calculation of the fair market value of the Ranch when discounted to reflect Gladys' life estate. To the extent blame for that error must be assigned, it would go to Gladys because her attorney gave the appraiser incorrect information. In addition, the erroneous appraisal of the Ranch has nothing whatsoever to do with the trial court's conclusion that Bob is entitled to specific performance because the court expressly found: "A prerequisite to specific enforcement of the contract is determining the price [as] set forth in the Trust. The probate Referee must re-appraise the Ranch to determine the fair market value on June 18, 2009 subject to Gladys' life estate in the residence." This requirement is also expressly incorporated into the final judgment which defines Gladys' life estate as "an exclusive right to use the residence, the yard immediately surrounding the residence, an easement for ingress and egress to and from the residence, and the right to use such water and power as she may require, all of which must be provided at no cost to [Gladys] for the remainder of her life."

Appellants also contend that principles of equity favor giving Donna an ownership interest in the Ranch because she wants to live on the Ranch, loves the outdoors and wants to provide her mother with assistance and companionship. However, despite her best effort, Donna is not and never has been a party to a valid contract to purchase an interest in the Ranch. She certainly is not a party to Bob's contract with the Trust. Thus, her wishes and desires are not even arguably a ground for challenging the trial court's discretion to grant Bob specific performance.

C.    *Donna's Liability for Intentional Interference With Bob's Contract*

Appellants contend there is insufficient evidence to support the judgment against Donna for intentional interference with contract.

"[I]n California, the law is settled that 'a stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract.' [Citations.] To prevail on a cause of action for intentional interference with contractual relations, a plaintiff must plead and prove (1) the existence of a valid contract between the plaintiff

18

and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. [Citation.]  To establish the claim, the plaintiff need not prove that a defendant acted with the primary purpose of disrupting the contract, but must show the defendant's knowledge that the interference was certain or substantially certain to occur as a result of his or her action.  [Citation.]"  (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1148.)

Here, appellants contend there is insufficient evidence to support the second element of this tort, i.e., that Donna had knowledge of a valid contract between Bob and the Trust.  In making this claim, appellants do not dispute that Bob's contract with the Trust was in fact valid, but claim only that there is insufficient evidence to establish that Donna knew Bob's contract was still valid when she exercised her option to purchase an undivided one-half interest in the Ranch.

To support this claim, appellants once again ignore substantial evidence that Donna acted with complete indifference to Bob's legal rights.  Instead, they rely exclusively on Donna's own trial testimony.  First, as the sole judge of witness credibility, the trial court was not bound to accept that testimony.  Second, Donna never did testify that she genuinely doubted that Bob had a valid contract.  Rather, she testified that when she exercised her option, she knew Bob's option was "still pending" but she thought that, because Bob had not "moved forward" and "wasn't consummating anything," Gladys had the "right" to give her the option to purchase an interest in the Ranch.[4]  This testimony does not establish that Donna did not know Bob had a valid

---

[4]  The pertinent testimony was as follows:

"[Question]:  Now, were you aware when you signed the option that Bob had this—his option still pending?

"[Answer]:  Yes.

"[Question]:  And what was your thought process on that?

19

contract but only that she felt her own actions were justified because she acted more swiftly than Bob did.

Appellants also contend that Donna reasonably relied on the advice of attorney Oglesby that Bob did not have a valid contract. First, we find no evidence that Oglesby ever advised Donna that Bob's contract was invalid. Mary, who was also a named defendant in this case, testified that Oglesby told Gladys that Bob did not have a binding contract during the June 6, 2011, meeting. However, Donna did not attend that meeting and there is no evidence that this erroneous legal opinion was ever shared with her. On the other hand, there is evidence that, on a prior occasion, Oglesby expressly advised Donna that Bob's option gave him the right to purchase the entire Ranch. The record also clearly shows that this advice did not deter Donna in her persistent efforts to obtain an ownership interest in the Ranch.

Second, even if there is some evidence that Donna actually relied on Oglesby's advice, that fact would neither automatically nor necessarily justify Donna's decision to exercise her option when she knew it would prevent Bob from completing his contract with the Trust. "An action will lie for the intentional interference by a third person with a contractual relationship either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification. [Citations.]" (*Herron v. State Farm Mutual Ins. Co.* (1961) 56 Cal.2d 202, 205.) "Justification for the interference is an affirmative defense and not an element of plaintiff's cause of action. [Citations.] . . . [¶] The test of whether there is justification for conduct which induces a breach of contract turns on a balancing of the social and private importance of the objective advanced by the interference against the importance of the interest interfered with, considering all the circumstances including the nature of the actor's conduct and the relationship between the parties. [Citations.]" (*Richardson v. La Rancherita* (1979) 98 Cal.App.3d 73, 80-81.)

---

"[Answer]: That it had—Robert hadn't moved forward and executed any further action on it. He wasn't consummating anything, that it gave Mom the right to give it to me, so I acted on it."

20

Here, the record supports the conclusion that the objective that Donna sought to advance by interfering with Bob's contract was to obtain an ownership interest in a piece of property that she had long coveted and long been denied. That objective did not outweigh the importance of the interest she interfered with, i.e., Bob's right to fulfill the express wishes of the trustors by purchasing the entire Ranch from the Trust in order to ensure that Robert's inheritance remained intact under the ownership of a single family member.

Furthermore, "[s]omething other than sincerity and an honest conviction by a party in his position is required before justification for his conduct on the grounds of 'good faith' can be established. There must be an objective basis for the belief which requires more than reliance on counsel. It is the opinion of counsel that must be examined, recognizing that creative and conscientious lawyers should be given every opportunity to challenge outmoded precedent to permit constructive development of the law. [Citation.] However, to merely equate reliance on an attorney's advice with 'good faith' is to shield those parties from liability who seek and obtain counsel. To create such a blanket rule of immunity is unwarranted." (*Richardson v. La Rancherita, supra*, 98 Cal.App.3d at pp. 82-83, fn. omitted.)

This record supports the conclusion that Donna's alleged reliance on Oglesby's erroneous legal opinion was objectively unreasonable and did not justify her decision to intentionally prevent Bob from completing his contract to purchase the entire Ranch from the Trust. Donna had a copy of the Trust instrument which gave Bob the option to purchase the entire Ranch. Donna was present when Bob exercised that option. She was also present almost a year later when Oglesby advised her, Gladys and Bob, that Bob had a contractual right to purchase the entire Ranch. Nevertheless, after another visit from Gladys who was armed with Mary's list of concerns and Donna's reminder that Gladys had a "REVOCABLE" trust, Oglesby told Gladys she was free to give Donna an option to purchase a half interest in the Ranch. In light of these circumstances, even if Donna was privy to Oglesby's erroneous opinion, her blind acceptance of it did not justify her

21

decision to immediately exercise the option Gladys had given her in order to preclude Bob from completing his contract.

Appellants also contend there is insufficient evidence that Donna committed intentional acts designed to induce a breach or disruption of the contractual relationship. They point out that the trial court made an express finding that "[n]one of the Defendants are responsible for Gladys' decision to execute the Third Amendment to the Trust" and they suggest this finding is inconsistent with the conclusion that Donna intended to interfere with Bob's contract. Appellants also rely on evidence that Donna did not even know about the Third Amendment until the July 15, 2011, family meeting at Oglesby's office.

However, appellants' contention that Donna did not induce Gladys to execute the Third Amendment is a straw man argument. The trial court did not find that Donna interfered with Bob's contract by convincing her mother to give her the option; it found that she did so by *exercising* that option when she knew full well that it would prevent Bob from buying the Ranch. Donna conveniently ignores evidence that, over the course of several years, she aggressively lobbied for an opportunity to obtain an ownership interest in the Ranch, notwithstanding that she knew that Bob had a contractual right to purchase the entire property. Then, when she finally got her opportunity, she exercised her option as quickly as she could without ever questioning why Oglesby's advice had changed and despite the fact that Bob had requested time to seek legal advice. This and other evidence summarized above supports the conclusion that Donna intentionally interfered with Bob's contract to purchase the Ranch.

Finally, appellants contend that the trial court erred by awarding Bob his attorney fees incurred in this litigation as damages for Donna's intentional interference with his contract to buy the Ranch. However, this claim of error rests solely on appellant's erroneous claim that Donna is not liable for interference with contract. Because we reject that premise, we also reject appellants' claim that Donna is not liable for Bob's attorney fees.

22

## IV.  DISPOSITION

The judgment is affirmed.

_____
Haerle, Acting P.J.

We concur:

_____
Richman, J.

_____
Brick, J.*

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.