Filed 8/12/21  Birden v. The Regents of the University of Cal. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| NICOLE BIRDEN, | B302956 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC663189) |
| v. | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael L. Stern, Judge.  Affirmed as modified.

Horvitz & Levy, Karen M. Bray, Bradley S. Pauley, Eric S. Boorstin; Gordon Rees Scully Mansukhani, Stephen E. Ronk, Erika L. Shao; AlvaradoSmith and Raul F. Salinas for Defendant and Appellant.

V. James DeSimone Law, V. James DeSimone, Carmen D. Sabater and Ryann E. Hall for Plaintiff and Respondent.

The Regents of the University of California (appellant or the Regents) appeal from a judgment entered following a jury trial in this action for violations of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) brought by Nicole Birden (respondent), an African-American phlebotomist formerly employed at UCLA Medical Center. The case went to trial on three FEHA causes of action: wrongful termination based on racial discrimination, wrongful termination in retaliation for complaints, and racial harassment (hostile work environment). Respondent claimed noneconomic damages based on emotional distress, as well as economic damages, which were exclusively described as past and future loss of earnings stemming from her termination.

By special verdict the jury determined that respondent was not wrongfully terminated, finding that race was not a substantial motivating reason for respondent's termination and that respondent did not complain about racial discrimination. Thus her termination was not wrongful. However, the jury did find that respondent was subjected to unwanted harassing conduct because she was African-American.

Although the jury found that respondent was not wrongfully terminated, it awarded respondent past economic damages (in the form of lost wages) in the amount of $190,033.92, and future economic damages (in the form of lost wages) in the amount of $86,112, for a total of $276,145.92 in economic damages. The jury also awarded respondent $500,000 in past noneconomic damages and $800,000 in future noneconomic damages, for a total of $1.3 million in noneconomic damages. The trial court awarded respondent both the economic and noneconomic damages, for a total award of $1,576,145.92.

The Regents moved for a new trial, arguing, among other things, that the award of $276,145.92 in economic damages (lost wages) was improper due to the jury's specific finding that respondent's termination was lawful. The trial court denied the motion concluding that the jury's findings on damages were justified. The Regents appeal only the narrow issue of whether the award of $276,145.92 for lost wages was lawful in light of the jury's determination that respondent was not wrongfully terminated.

We find that the jury's award of economic damages in the form of lost wages violated the jury instructions and was fundamentally inconsistent with the jury's specific finding that respondent was not wrongfully terminated. We therefore strike the award of $276,245.92 in past and future economic damages. As modified, we affirm the judgment.

## FACTUAL BACKGROUND

Respondent began her employment as a phlebotomist at UCLA Medical Center in March 2015 as a temporary employee. In October 2015, respondent was hired as a per diem phlebotomist. Per diem employees are at-will workers who supplement the staff of career health professionals at the medical center. Some of the medical center's phlebotomists acted as dispatchers, assigning other phlebotomists to draw patients' blood throughout the day in various parts of the hospital. Respondent did not act as a dispatcher; instead, she was required to draw blood at the direction of the dispatchers.

**Harassment by coworkers**

When respondent began working at UCLA Medical Center she heard a rumor that her coworkers were saying "there is a new Black girl in the laboratory with an attitude." Respondent

3

thought this rumor was without basis and was bothered by it. When respondent entered the lab she heard offensive comments in Spanish, such as "morena," "vaga," "mentiroso" and "perizoso,"[1] made by phlebotomists Maria Contreras, Virginia Martinez, Mayra Rivers and Oscar Torres. The comments made respondent feel unwelcome.

Another phlebotomist, Brian Andrade, used the word "nigger"[2] in casual conversation. Andrade addressed respondent as the n-word a number of times. Andrade played music using the n-word daily. Supervisors were aware of the music as they would enter the laboratory frequently while the music was playing. Respondent told Andrade not to use the n-word to her, but he did not comply. Respondent found use of the n-word offensive, although she did not think Andrade was malicious in his use of the word.

Respondent described an "air of mistrust" about her among her supervisors and coworkers. Respondent observed the lead dispatcher, Torres, standing behind doors seemingly watching her. Respondent also described other rumors that circulated about her that were untrue. Specifically a rumor started by Rivers that respondent stuck a patient with a needle seven times without drawing blood. Respondent found this insulting because it suggested that she was not good at her job. In addition, the same coworkers who would use derogatory terms about her would accuse respondent of not communicating with them when they acted as dispatchers. Respondent would routinely leave her

---

[1] Translated, these words refer to a Black woman, and refer to her as lazy and a liar.

[2] We will not repeat this word in the opinion and will reference it as the "n-word."

phone on the cart outside the door or in the hallway while she was drawing blood. When she returned dispatch's phone calls she would be scolded and questioned as to her whereabouts and asked what she was doing. Phlebotomists, including Contreras and Elizabeth Reyes, would complain to Chanida Anukul, respondent's supervisor, that respondent was not answering her phone.

Respondent testified that she was assigned a disproportionate number of blood draws. The large number of draws was challenging, and respondent would have to prioritize a number of new and urgent draws throughout the day. Respondent was also not able to take timely breaks. Respondent testified that when she was assigned additional blood draws she knew there were other phlebotomists in the laboratory that could have done the work. Rivers complained to Anukul that when Rivers attempted to make additional assignments to respondent, respondent reacted in a hostile manner.

In addition, respondent claims that Contreras and Martinez intentionally manipulated the way blood draws were assigned to make it appear as if respondent did not complete all of her draws. Rivers and Martinez would also falsely complain to Anukul that respondent was not finishing her work. In addition, Rivers and Martinez accused respondent of mislabeling her specimens.

Respondent told Anukul that she was being falsely accused and that she always performed her blood draws unless the patient refused or was otherwise unavailable. Respondent attempted to bring her concerns about these false accusations to Anukul's attention.

5

**Complaints about respondent**

In November 2015, respondent was observed by lead phlebotomist Brett Westfall crossing a street near the medical center when she should have been inside performing blood draws. Westfall reported his observation to Anukul and Torres (the lead dispatcher). Westfall noted that respondent was wearing her lab coat, which is not to be worn offsite per the medical center's policy. Anukul then told respondent that she should communicate with dispatchers if she needed to leave the work area outside of her break time.

The same month a coworker, Luisha Lauraeno, accompanied respondent to a blood draw on a patient in police custody. The testimony was in conflict as to whether respondent asked Lauraeno to accompany her, or whether Lauraeno offered to go along with respondent because she did not have an assignment at that time. Anukul called respondent into her office to discuss the incident. Anukul counseled respondent regarding the importance of the dispatch system and the need to inform dispatchers if she needed assistance. Respondent felt she was wrongly accused of asking Lauraeno to go with her. Respondent told Anukul that she did not ask Lauraeno to accompany her.

Several dispatchers continued to complain that, during her shifts, respondent failed to answer her cell phone, which was provided by the medical center for the purpose of receiving calls and directions from the dispatchers. Dispatcher Rivers reported an incident during which respondent did not answer her cell phone for over 30 minutes. When she finally answered, she was rude, confrontational, and hung up abruptly. Rivers described respondent as "hostile," and indicated that respondent slammed the phone to hang up. Rivers felt harassed by respondent's

behavior.  Rivers asked for assistance with respondent's behavior as it was "happening with most of the female dispatchers when working with her and now it[']s affecting patient care."

**Respondent's complaints about harassment and bullying**

On December 4, 2015, respondent complained to Anukul about her coworkers making false complaints:  "[i]t is really disturbing that my name keeps floating around in a non positive manner and a selective few people are being followed around on the floor. . . .  [¶]  [H]arassment and bullying is not allowed, this is a constant and ongoing problem . . . ."  Anukul did not bring the complaint to human resources despite respondent's complaints that she was receiving excessive phone calls from dispatch.

Respondent was the subject of other petty complaints in 2016, such as a false claim that she was riding up and down in the elevator.  Respondent told Anukul, "[A]t this point this is kind of ridiculous these false accusations that are being made about me."

Respondent, bothered by the use of derogatory remarks and insulting language, brought up the issue with laboratory director Anthony Johnson on March 8, 2016.  Respondent wrote:

> "I would like to ask if you can please reiterate the importance of English usage in the Laboratory.  The over excessive use of Spanish, inappropriate conversations, and loudness is very unprofessional, offensive, and rude at times.  Also, moving forward with the new Beaker/Rover program, I hope the inpatient lab draws will now start to be issued in a fair and unbiased manner."

Johnson did not respond to respondent nor did he seek clarification of her complaint.  He viewed the e-mail as contrary to the Regents' policy of permitting employees to speak other

7

languages at work, as long as conversations about patient care were in English.

**Incident with Contreras**

On March 29, 2016, respondent had documented that a patient was unavailable for a blood draw because the patient was having an ultrasound. Respondent returned to restock her cart for the next shift. Contreras questioned respondent why she did not draw blood from the patient. Respondent maintained that she had documented the reason on the medical chart, and there was no reason for Contreras to accuse her of falsifying the record. Contreras noted that respondent did not include the nurse's name on her notes. Contreras asked respondent if she knew the name of the nurse who reported that the patient was in ultrasound. Respondent stated that she did not know. Contreras called the patient's floor and spoke to a nurse who said the patient had been present in her room and had not seen a phlebotomist. The nurse again asked the laboratory to send a phlebotomist to draw the patient's blood. Contreras testified that respondent approached her aggressively and stated that the patient was having an ultrasound. Contreras further reported that respondent stated this fact was written in the notes and "IF YOU COULD NOT READ OR UNDERSTAND ENGLISH [THAT] IS NOT MY PROBLEM." Contreras responded, "Please don't talk to me th[at] way[.] [I]f you have a problem[,] talk to [my] supervisor[s,] Chanida or Oscar."

Contreras, for whom English is a second language, told human resources that she felt discriminated against based on her "accent and national origin." Contreras added that she felt humiliated because respondent did this in front of coworkers. She felt respondent's actions created a hostile work environment that was coming to the point where it was "affecting patient

8

care." Contreras sent the same e-mail that she sent to human resources to Anukul.

As a result of Contreras's e-mail, Anukul contacted Joshua Samuels, an employee relations manager in the UCLA Medical Center human resources department. In consultation with Samuels, Anukul investigated the incident. She first spoke with Contreras, who was distraught and insulted by what she characterized as racial discrimination against her. Anukul then interviewed two employees who witnessed the encounter, Alondra Wilburn and Elizabeth Rays. Each confirmed Contreras's account of the events and that respondent insinuated Contreras could not read or understand English.

Anukul then spoke with respondent who acknowledged that she had made a comment about Contreras's English abilities. Respondent told Anukul that she had become angry because Contreras insinuated that she was being untruthful about the patient being in ultrasound. Anukul reminded respondent that full documentation is required, including the name of the nurse.

Anukul shared her findings with Samuels, who advised that a counseling memorandum should be placed in respondent's file, documenting the incident, because it is inappropriate to accuse someone of not speaking English in the workplace. No such memorandum was prepared.

On April 7, 2016, three days after Anukul interviewed respondent, respondent sent Anukul an e-mail in which she insisted it was not standard practice to record a nurse's name when a blood draw is deferred. Respondent asserted that the nurse's name was not vital information and respondent's failure to record the nurse's name "shouldn't [have] prompted [Contreras] to interrogate me and exaggerate the situation the

9

way she did." Because documenting the nurse's name is required, Anukul responded, "Please continue to document the nurse[']s name in your comments." Anukul followed that e-mail with a similar one to all phlebotomists to ensure everyone was aware of the rule that nurse names should be documented.

**Respondent's absences and tardiness**

Throughout her time at the medical center respondent was often late for work or absent from scheduled shifts. In May 2016, Anukul noted that respondent had been absent four times in a three-month period (February to April 2016) and had been late frequently. Respondent's attendance record triggered the medical center's policy requiring a supervisor's review. Anukul prepared a draft counseling memorandum regarding respondent's attendance problems and on May 18, 2016, asked Samuels to review it.

In evaluating respondent's attendance issues, Samuels inquired whether respondent was a "special" or "ordinary" per diem employee. A special per diem employee is one who worked over 1,000 hours in the last year and committed to work at least 50 percent of the time. Such employees were subject to a progressive discipline process. On the other hand, ordinary per diem employees could be dismissed at the discretion of their supervisors. Anukul determined that, based on the number of hours respondent had worked in the previous year, she was an ordinary per diem employee.

**Respondent's termination**

Anukul decided to release respondent from the schedule—effectively terminate her employment—based upon respondent's excessive absences and tardiness, her failure to communicate with the laboratory dispatchers, and her confrontation with

Contreras in which respondent had appeared "racially discriminatory."

On June 2, 2016, Anukul met with respondent and explained that respondent was being released from the schedule. Anukul advised respondent that she was eligible for rehire.

**Events following respondent's termination**

In July 2016, shortly after being released from the schedule, respondent reapplied for her former position as a phlebotomist at the medical center. Respondent was not interviewed for the position.

Respondent testified that she was out of work for 15 months and lost earnings during that time. She eventually found employment at Kaiser at a lower compensation rate to what she had expected to make at UCLA Medical Center.

## PROCEDURAL HISTORY

**Complaint**

On November 21, 2016, respondent filed an administrative complaint against the Regents with the Department of Fair Employment and Housing (DFEH), alleging that she had been subjected to discrimination, harassment, and retaliation on the basis of her race and age. Respondent requested that DFEH issue an immediate right to sue letter, which it did the same day without opening an administrative investigation.

In May 2017, respondent sued the Regents, alleging race discrimination, age discrimination, harassment, and retaliation in violation of FEHA. She also alleged failure to prevent discrimination and harassment in violation of FEHA, retaliation in violation of Health and Safety Code section 1278.5, and breach of the covenant of good faith and fair dealing. Respondent claimed that she was wrongfully terminated based on her race

11

and in retaliation for complaining about racial discrimination and harassment.

**Trial**

Trial commenced in July 2019 on three FEHA causes of action: wrongful termination based on racial discrimination, wrongful termination in retaliation for complaints, and racial harassment (hostile work environment).

Respondent sought two categories of damages: (1) economic damages, which were exclusively described as lost wages during the period after her termination from employment at UCLA Medical Center and the pay differential between her pay at UCLA Medical Center and her position at Kaiser; and (2) noneconomic damages, which she sought based on the emotional distress she suffered from the harassment and loss of her job. Respondent did not present any evidence that the harassment by her colleagues caused her to lose earnings or that she missed work as a result of the harassment.

**Jury instructions and special verdict**

The jury was given specific instructions as to how it was to calculate damages. First, the jury was instructed:

"The damages claimed by [respondent] for the harm caused by The Regents fall into two categories called economic damages and noneconomic damages. You will be asked on the verdict form to state the two categories of damages separately."

As to economic damages, the jury was specifically instructed:

"[Respondent] claims past and future loss of earnings as her specific items of economic damages.

"If you find that The Regents discharged [respondent] for discriminatory or retaliatory reasons, then you must decide the amount of past

12

and future lost earnings that [respondent] has proven she is entitled to recover, if any."

Thus, the jury instructions made it clear that past and future lost earnings were the only economic damages that respondent was seeking, and the jury should calculate such damages only if it determined that respondent was discharged for discriminatory or retaliatory reasons.

The jury found that respondent was not discharged for discriminatory or retaliatory reasons. The first question on the special verdict form was, "Was [respondent's] race a substantial motivating reason for the Regents' discharge of [respondent]?" The jury answered "No." Thus, the jury was directed to skip the next question, "Was the Regents' discharge a substantial factor in causing harm to [respondent]"? The jury did not provide a response to this second question.

As to retaliation, the jury was first asked, "Did [respondent] complain about racial discrimination and/or racial harassment?" The jury answered, "No." Because the jury answered this question in the negative, the jury was not required to answer the following two questions as to whether respondent's complaint of racial discrimination was a substantial motivating factor in the Regents' decision to discharge respondent, and whether the Regents' conduct was a substantial factor in causing harm to respondent. The jury did not provide responses to these questions.

The jury answered "Yes" to question 6, "Was [respondent] subjected to unwanted harassing conduct because she was African American?" The jury also found that such harassment created a hostile work environment, and respondent's supervisors knew or should have known of the harassing conduct.

13

Despite the specific instruction that the jury should only calculate economic damages (lost wages) if it found that respondent had been wrongfully discharged, the jury calculated $190,033.92 in past lost wages and $86,112 in future lost wages. The damages award was specifically set forth as follows:

"13. What are [respondent's] damages?
"a. Past economic loss: $190,033.92
"b. Future economic loss $86,112.00
"c. Past Emotional distress and mental harm $500,000.00
"d. Future Emotional distress and mental harm $800,000.00
"TOTAL $1,576,145.92"

On September 11, 2019, the trial court entered a judgment on the special verdict, awarding respondent the full $1,576,145.92.

**The Regents' motion for new trial**

On October 7, 2019, the Regents filed a motion for new trial. The Regents argued that while the jury's liability findings made sense, not so its damage award, because the jury awarded respondent $276,145.92 in past and future economic damages (i.e., lost wages) even though it found the Regents not liable for wrongful termination.[3] In support of this argument, the Regents cited Civil Code section 3333, which mandates that the measure of damages for noncontractual obligations is limited to the

---

[3] The Regents also argued that the jury's award of $1.3 million in noneconomic damages was grossly excessive.

14

detriment proximately caused thereby. In addition, the Regents cited *Lombardo v. Huysentruyt* (2001) 91 Cal.App.4th 656, 665, for the proposition that a defendant's conduct must be a substantial factor in bringing about the alleged harm. The Regents argued that the lost wage damages were caused by respondent losing her job, and her termination was lawful. Further, there was no evidence that the harassment of respondent in any way caused her lost wages.

Respondent opposed the Regents' motion for new trial, arguing that the harassing conduct was a substantial factor in causing her economic harm. Respondent cited Code of Civil Procedure section 657, which states that a court shall not grant a new trial "unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom," that it clearly should have received a different verdict or decision. Respondent cited *Bigboy v. County of San Diego* (1984) 154 Cal.App.3d 397, 406, for the proposition that a court may not "substitute [its] judgment for that of the jury on the question of damages unless it appears from the record the jury verdict was improper." Respondent argued that because the harassing conduct was a substantial factor in causing respondent's economic harm, the verdict was not inconsistent.

The trial court heard extensive oral argument on November 12, 2019. It denied the Regents' motion for new trial, holding:

> "I think there is sufficient evidence that the jury is justified in the verdict that it rendered both on liability and damages factors, given the instructions of law that were given with the presented facts. And the damages are . . . not disproportionate to the harm that was presented by the facts that the jury had for consideration."

15

**Appeal**

On December 11, 2019, the Regents filed a notice of appeal from the judgment after jury trial.

## DISCUSSION

### I. Applicable law and standard of review

A trial court may vacate or modify a verdict in whole or in part or grant a new trial on the grounds of "[i]nsufficiency of the evidence to justify the verdict . . . or [if] the verdict . . . is against the law." (Code Civ. Proc., § 657.) In bringing the motion for new trial the Regents argued that the award of economic damages was "against the law" because the Regents were found not liable for wrongful termination and therefore the Regents could not be held liable for past and future economic loss.

Generally "[w]e will not disturb the trial court's determination of a motion for a new trial unless the court has abused its discretion. [Citation]. When the court has denied a motion for a new trial, however, we must determine whether the court abused its discretion by examining the entire record and making an independent assessment of whether there were grounds for granting the motion." (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832.) "'An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice.'" (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1415.) We may reverse a trial court's decision "if there is no reasonable basis for the court's decision or the decision is based on a legal error." (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1122.)

16

Generally a plaintiff is required to present substantial evidence of causation linking the defendant's misconduct to the damages. (Civ. Code, § 3333 [damages for breach of obligation not arising from tort is "detriment proximately caused thereby"]; see *Spackman v. Good* (1966) 245 Cal.App.2d 518, 534 [reversing award where evidence not sufficient to establish defendant's misconduct was the cause of plaintiff's harm].) Under the substantial evidence test "'[the] power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings." (*Estate of Leslie* (1984) 37 Cal.3d 186, 201.) We must therefore view the evidence in the light "'most favorable to the prevailing party, giving [that party] the benefit of every reasonable inference.'" (*Ibid.*) Substantial evidence "must be reasonable in nature, credible and of solid value." (*Lane & Pyron, Inc. v. Gobbs* (1968) 266 Cal.App.2d 61, 68.)

The standard of review for inconsistency in a special verdict is de novo. (*Trejo v. Johnson & Johnson* (2017) 13 Cal.App.5th 110, 124.) "'A court reviewing a special verdict does not infer findings in favor of the prevailing party [citation], and there is no presumption in favor of upholding a special verdict when the inconsistency is between two questions in a special verdict.'" (*Ibid.*)

## II.    Relevant FEHA law

FEHA defines discrimination, retaliation, and harassment as separate and distinct wrongs. (Gov. Code, § 12940, subds. (a), (h) & (j)(1); *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 705 (*Roby*) ["In the FEHA, the terms 'discriminate' and 'harass' appear in separate provisions and define distinct wrongs."]; *Mathieu v. Norrell Corp.* (2004) 115 Cal.App.4th 1174, 1188 [harassment and retaliation for complaining of the harassment

17

constitute two separate and distinct grounds for liability under FEHA].) Discrimination involves an official action taken by an employer, such as "hiring, firing, [or] failing to promote." (*Roby, supra*, at p. 706.) Retaliation involves circumstances in which an employer penalizes an employee for reporting or opposing FEHA violations. (*Mathieu, supra*, at p. 1188.) "By contrast, harassment often does not involve any official exercise of delegated power on behalf of the employer." (*Roby, supra*, at p. 706.) Instead, harassment focuses on situations in which "the *social environment* of the workplace becomes intolerable because the harassment . . . communicates an offensive message to the harassed employee." (*Ibid.*)

Each distinct wrong can lead to distinct remedies. (*Roby, supra*, 47 Cal.4th at p. 707.) In addition, where a plaintiff proves one wrong, but not another, the plaintiff is limited to the remedies arising from the specific violation proven. For example, in *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228 (*Taylor*), the plaintiff was not entitled to lost compensation because he had not prevailed on his claim for retaliatory discharge. The *Taylor* court held that "[s]ince the jury determined that respondent was lawfully discharged, he was not entitled to recover damages for lost compensation." (*Id.* at p. 1248.)

III. **Respondent failed to prove discriminatory or retaliatory discharge and therefore was not entitled to lost wages**

The trial of this matter involved three distinct wrongs: wrongful termination based on racial discrimination, wrongful termination in retaliation for complaints, and racial harassment (hostile work environment). Respondent failed to prove that she

18

was wrongfully terminated on either a racial discrimination theory or a retaliation theory.

Respondent proceeded on distinct theories supporting her entitlement to remedies. As to economic damages, her "specific items of economic damages" were limited to "past and future loss of earnings." Such lost earnings were tied only to respondent's two theories of wrongful termination. The jury was specifically instructed that "*[i]f* you find that The Regents discharged [respondent] for discriminatory or retaliatory reasons, *then* you must decide the amount of past and future lost earnings that [respondent] has proven she is entitled to recover, if any." (Italics added.)

Respondent did not prevail on her claims of wrongful termination. Thus she is not entitled to economic damages in the form of lost wages. Because lost wages were the only specific items of economic damages respondent sought, she is not entitled to any economic damages in this matter. (*Taylor, supra*, 222 Cal.App.4th at p. 1248.)

Respondent argues that all damages, including lost wages, are recoverable in a FEHA harassment case. However the cases cited by respondent are distinguishable. They involve situations where the employee either resigned or was constructively discharged. (See, e.g., *Cloud v. Casey* (1999) 76 Cal.App.4th 895, 906-909 (*Cloud*); see also *Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577 (*Hope*); *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 996 (*Bihun*), disapproved on other grounds in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644.) None involves a situation where, as here, the employee was lawfully terminated from employment for reasons that were neither discriminatory nor retaliatory.

19

In *Cloud*, an employee voluntarily resigned after being passed over for the position of controller on the basis of her gender. (*Cloud, supra*, 76 Cal.App.4th at p. 909.) While it was her choice to leave or remain at her job, both decisions involved continuing harm from the discrimination she suffered. (*Ibid.*) Thus, the *Cloud* court determined that the trial court had erred in limiting her damages to the period of time before she willingly terminated her own employment. (*Ibid.*)

In *Hope*, an employee took a medical leave of absence after years of severe sexual orientation harassment. (*Hope, supra*, 134 Cal.App.4th at p. 587.)[4] He never returned to work. (*Hope*, at p. 587.) Among other things, the employer argued that the economic damage award to the employee was not supported by the evidence. In affirming the award, the *Hope* court noted that "the jury implicitly determined that, but for the harassment, Hope would have been employed by the state until retirement age." (*Id.* at p. 594.)

The matter before us is distinguishable because the jury specifically found that respondent's termination was not

[4]     The *Hope* plaintiff suffered years of sexual orientation harassment leading to serious medical problems. His treating psychiatrist testified that "beginning sometime between six and 10 months after Hope started work, he was under 'enormous tension and pressure and anxiety' because of 'mistreatment' from coworkers and the administration, as well as a lack of 'protection and support from management.' The anxiety caused Hope to develop a bleeding blister in the retina of his right eye, leading to permanent loss of vision. Other than hand motions within a few feet of his face, Hope cannot see anything through his right eye. Hope's physician told him that this type of blindness is typically caused by job stress and that it is more common in doctors and lawyers." (*Hope, supra*, 134 Cal.App.4th at pp. 584-585.)

unlawful. In contrast to the implicit finding in *Hope* that, but for the harassment, the plaintiff would have been employed until retirement, the jury in this case implicitly found that respondent's termination was unrelated to any harassment. The evidence fully supports the jury's conclusion. In contrast to the plaintiff in *Hope*, who took medical leave after years of harassment requiring psychiatric and medical treatment, respondent in this matter wanted to continue working at UCLA Medical Center. In fact, after her termination she reapplied for her position as a phlebotomist at the UCLA Medical Center. Respondent presented no evidence that her superiors, who were responsible for her termination, ever behaved in a way that was harassing to her. On the contrary, she testified that they were "professional" and "cordial" to her and never made any racially derogatory comments. The circumstances of respondent's termination were not comparable to the extended medical leave and constructive discharge that occurred in *Hope*.

Finally, *Bihun* involved a female employee who was subjected to unwanted sexual advances by a superior. (*Bihun, supra*, 13 Cal.App.4th at pp. 985-986.) When she rejected her superior's advances, he retaliated by taking away her responsibilities to the point where she had nothing to do. (*Id.* at p. 986.) She went on disability leave for an adjustment disorder, anxiety and depression, which her doctor attributed to what had occurred at work. (*Ibid.*) When she returned to work she was demoted to a position two levels below her previous position where she had no skills or experience. Shortly thereafter, she resigned. (*Ibid.*) On appeal, the employer attacked the award of compensatory damages as excessive. (*Id.* at p. 996.) Among other things, the employer argued that the award of future loss of earnings was not supported by the evidence. The *Bihun* court

disagreed, stating that there was sufficient evidence that, but for the sexual harassment, the plaintiff would have remained at her previous employer indefinitely, and the jury could reasonably have concluded that she would have remained there.  (*Ibid.*)

In this matter there was no room for the jury to infer that, but for the harassment, respondent would have remained at her job.  She was terminated for three reasons: (1) excessive absences and tardiness, (2) her failure to communicate with the laboratory dispatchers, and (3) her confrontation with Contreras in which respondent had appeared to behave in a way that was "racially discriminatory."  The jury was entitled to believe Anukul's testimony as to the reasons for respondent's termination.  The jury was also entitled to believe that none of these reasons stemmed from any racial animus or retaliatory motive.  We must credit the jury's findings that the reasons for respondent's termination were not unlawful.

Despite the jury's finding that respondent's termination was not unlawful, respondent argues that the jury was entitled to conclude the harassment was a substantial factor in causing respondent's lost wages.  Respondent argues that she proved the causal link between the harassment she suffered and her termination because the reasons Anukul gave for terminating her were directly related to the harassing incidents respondent suffered.  Respondent's argument is contrary to the jury's finding. Respondent has failed to cite a California case suggesting that where an employee suffered harassment by coworkers, but was lawfully terminated by her employer for legitimate reasons unrelated to any unlawful motive, that employee may receive compensation in the form of lost wages.  Under the circumstances of this case—particularly because the jury was instructed to

award lost wages only if it found wrongful termination—respondent's position is unsupported in the law.[5]

---

[5] Appellant points out that many federal cases decided under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) (Title VII) have held that a harassment claim does not support a damage award in the form of lost wages in the absence of a constructive discharge. (*Spencer v. Wal-Mart Stores, Inc.* (3d Cir. 2006) 469 F.3d 311, 317 [a harassment claim in the absence of a successful constructive discharge claim is insufficient to support an award of lost wages]; *Saxton v. American Tel. & Tel. Co.* (7th Cir. 1993) 10 F.3d 526, 536-537 [to recover lost earnings on a hostile work environment claim, plaintiff "must prove that she was constructively discharged"], called into doubt on another ground by *Cooke v. Stefani Management Services, Inc.* (7th Cir. 2001) 250 F.3d 564, 568, fn. 3; *Bundy v. Jackson* (D.C. Cir. 1981) 641 F.2d 934, 946, fn. 12 [a claim for lost earnings is "irrelevant to" a hostile work environment claim]; *Targonski v. City of Oak Ridge* (E.D.Tenn. 2013) 921 F.Supp.2d 820, 826 ["Because plaintiff was neither terminated nor constructively discharged (nor 'forced to resign'), damages for lost wages are not available to her."].) Appellant also cites *Betts v. Costco Wholesale Corp.* (6th Cir. 2009) 558 F.3d 461, but this case was decided under Michigan law, not federal law. Because Title VII and other federal statutes have objectives and language similar to FEHA, "". . . California courts often look to federal decisions interpreting these statutes for assistance in interpreting the FEHA."" (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 812.) Appellant asks that we look to these federal cases as persuasive authority in making the same decision here. Respondent argues that, on the contrary, the California Supreme Court has rejected the argument that federal precedent should have a bearing on FEHA damages. (*Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 215 [holding that in a civil action under FEHA, all relief generally available in noncontractual actions, including punitive damages, may be obtained].) We find

## IV.    The special verdict is irreconcilable

"Inconsistent verdicts are "'against the law,'" and the proper remedy is a new trial." (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1344.) This rule is "'based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact based on the same evidence.'" (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682-684 (*San Diego*).) In *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280 (*Trujillo*), for example, the jury's finding that an employer failed to prevent discrimination and harassment was irreconcilable with the jury's finding that no discrimination or harassment had occurred. (*Id.* at p. 289.) As such, the jury's verdict was "too inconsistent to be enforced," as it lacked an "essential foundational predicate of harassment or discrimination." (*Ibid.*)

The jury here was instructed that respondent's economic damages were past and future lost wages. The jury was also instructed to calculate those economic damages *if* it found that the Regents discharged respondent for discriminatory or retaliatory reasons. The jury's finding that the Regents did not discharge respondent for a discriminatory or retaliatory reason is irreconcilable with its award of lost wages. (*Trujillo, supra*, 63 Cal.App.4th at p. 289.) In this case a finding of discriminatory or retaliatory termination was an "essential foundational predicate" to a finding of lost wages. (*Ibid.*)

---

that we need not rely on the federal cases appellant has cited as respondent failed to prove that she was wrongfully terminated and therefore failed to prove that she was entitled to lost wages under the specific claims made in this case. Such lost wages were awarded in error.

24

Respondent argues that the jury properly determined that the harassing conduct was a substantial factor in causing respondent's termination. Thus, respondent argues, the jury implicitly found that termination was a consequential harm attributable to the unlawful harassment. For example, respondent argues that the jury could have reasonably concluded that the communication issues were specious and were fabricated by respondent's colleagues in order to communicate a hostile message to respondent. Respondent points out that those communication issues, in part, led to respondent's termination.

The jury could, however, also have concluded the opposite—that the communication issues were not fabricated or specious. The jury was aware that communication issues were a factor in Anukul's decision to terminate respondent. Nevertheless, the jury found that the termination was not racially motivated. The Regents prevailed on this issue, and we must therefore give the Regents the benefit of every reasonable inference. (*Estate of Leslie, supra*, 37 Cal.3d at p. 201.)

The jury was instructed to calculate economic damages or lost wages *if* it found discriminatory or retaliatory termination. Respondent did not object to this very specific instruction. Given the jury's unequivocal findings that respondent was not terminated for discriminatory or retaliatory reasons, the jury instructions left no room for the jury to infer that the unlawful harassment led to lost wages. The award of lost wages in this matter violates the rule that "a jury's special verdict findings must be internally consistent and logical." (*San Diego, supra*, 126 Cal.App.4th at p. 681.)

## V.     "Cat's paw" instruction

The trial court refused to give respondent's proposed "cat's paw" instruction. A "cat's paw" instruction permits the jury to

25

find that an individual was terminated for discriminatory reasons even if the individual, or group of individuals, who made the termination decision did not act for discriminatory reasons. The "cat's paw" theory of liability was described in *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 113 (*Reeves*):

> "To establish an entitlement to judgment as a matter of law, it is not enough to show that one actor acted for lawful reasons when that actor may be found to have operated as a mere instrumentality or conduit for others who acted out of discriminatory or retaliatory animus, and whose actions were a but-for cause of the challenged employment action."

The doctrine is generally applicable where "discriminatory or retaliatory actions by supervisory personnel bring about adverse employment actions through the instrumentality or conduit of other corporate actors who may be entirely innocent of discriminatory or retaliatory animus." (*Reeves, supra*, 121 Cal.App.4th at p. 116.) The *Reeves* court noted that its emphasis on the conduct of supervisors was "not inadvertent," further noting that an employer's liability where the actor with the requisite animus is a nonsupervisory coworker is less clear. (*Id.* at p. 109, fn. 9.)

Respondent's proposed "cat's paw" instruction, if given, would have permitted the jury to find wrongful termination if it found that Anukul acted as a conduit of respondent's former coworkers who harbored discriminatory motives in harassing respondent. Had the jury been permitted to consider this theory, Anukul could have been found to be the "cat's paw" for other individuals' discrimination. The Regents would not necessarily have been spared from liability for wrongful termination and lost wages based solely on the harassing conduct of respondent's coworkers.

However the trial court refused to give respondent's proposed "cat's paw" instruction, and respondent has not appealed this ruling. Therefore, in order to find the Regents liable for discriminatory or retaliatory termination, the jury was required to find that Anukul and other supervisors who approved respondent's termination had discriminatory or retaliatory motives. The jury was not permitted to find that Anukul was the "cat's paw" of any of respondent's coworkers.

Respondent's argument that Anukul's decision to terminate respondent was influenced by her coworkers' harassing actions is an attempt to use the cat's paw theory to hold the Regents liable for the harassing conduct of respondent's coworkers. This theory was specifically rejected by the trial court. We may not, therefore, infer that the jury believed that the harassment caused lost wages. Instead, we view the jury's contradictory findings on liability and damages to be irreconcilable.

## VI.    Remedy on appeal

When the evidence is sufficient to sustain some, but not all, damages awarded, we may reduce the judgment to the amount supported by the evidence. (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 533.) In *Taylor*, for example, the appellate court found that the plaintiff's award of lost compensation was not supported by the evidence because the jury determined that the plaintiff was lawfully discharged. (*Taylor, supra*, 222 Cal.App.4th at p. 1248.) Because the *Taylor* court agreed that the economic damage award was unsupported by the evidence it reduced the plaintiff's award accordingly and affirmed the judgment as modified. (*Id.* at pp. 1233, 1252-1253.)

Because respondent in this matter was not unlawfully terminated, she was not entitled to compensation in the form of

27

lost wages.  We therefore reduce the judgment accordingly and affirm the judgment as modified.

## DISPOSITION

The judgment is modified to reduce respondent's damages from $1,576,145.92 to $1,300,000.  As modified, the judgment is affirmed.  Respondent's request for reasonable attorney fees and costs on appeal is denied.  Each party is to bear their own costs of appeal.

_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
HOFFSTADT, J.

28